64 P.3d 15 (2003)
148 Wash.2d 835
DAHL-SMYTH, INC., a Washington corporation, Petitioner,
v.
CITY OF WALLA WALLA, a municipal corporation, Respondent.
No. 72282-0.
Supreme Court of Washington, En Banc.
Argued November 19, 2002.
Decided March 6, 2003.
*16 James Sells, Silverdale, Polly McNeill, Seattle, for Petitioner.
Richard Wernette, Walla Walla, for Respondent.
Robert Beaumier, Spokane, amicus curiae on behalf of City of Walla Walla.
Leslie Nellermoe, Seattle, amicus curiae on behalf of Waste Management of Wash.
Mary Spillane, David Wiley, Seattle, amicus curiae on behalf of Wash. Refuse and Recycling Ass'n.
BRIDGE, J.
This case requires us to determine how "measurable damages" should be calculated when a city annexes territory covered by the certificate of a private solid waste collection company. Former RCW 35A.14.900 (1996) provides that when a city annexes territory, the city may allow the territory's garbage hauler to continue to serve the territory for five years.[1] If the city so chooses, the city must pay "any measurable damages as a result of any annexation." RCW 35A.14.900. The Court of Appeals held that "measurable damages" do not include the loss in value to the certificate and that such damages must be capable of exact measurement. We reverse.

*17 I

FACTS
Dahl Smyth, Inc. (DSI) provided exclusive solid waste collection service in portions of Walla Walla County pursuant to a Certificate of Public Convenience and Necessity (commonly called a "G certificate") issued by the Washington Utilities and Transportation Commission (WUTC) as required by RCW 81.77.040. Private solid waste collection companies, such as DSI, are subject to the supervision and regulation of the WUTC. RCW 81.77.030. The WUTC sets the rates that a certificate-holder may charge and may suspend, revoke, alter, or amend the certificate for cause. Id.
Between 1982 and 2000, the City of Walla Walla (City) periodically annexed various portions of DSI's territory containing a total of 269 occupied housing units. Under former RCW 35A.14.900, all utility franchises are automatically cancelled upon annexation.[2] However, a city may elect to continue a garbage hauler's service after annexation. RCW 35A.14.900. In this case, DSI continued to serve the annexed territories for at least five years after the annexations occurred, although the City did not always grant DSI formal franchise extensions. Thereafter, the City chose to provide its own solid waste collection service, thus decreasing DSI's territory with each annexation.
In August 1985, DSI brought suit against the City in Walla Walla County Superior Court, seeking "measurable damages" as a result of the City's annexations of its territory between 1960 and 1984. By agreement of the parties, the City did not file an answer until July 1999 because both parties were awaiting a decision in a similar case involving DSI, the neighboring city of College Place, and many of the same issues. See Dahl-Smyth, Inc. v. City of College Place, No. 7102-2-III (Wash.Ct.App. Feb.5, 1987).[3] That case ultimately resulted in an unpublished Court of Appeals opinion. 46 Wash.App. 1049 (1987).
Both parties moved for partial summary judgment in 1999. Due to the College Place decision, the trial court found that DSI was collaterally estopped from arguing that the City was required to grant formal franchise extensions, and that "measurable damages" do not include lost profits.[4] Citing Metropolitan Services, Inc. v. City of Spokane, 32 Wash.App. 714, 649 P.2d 642, review denied, 98 Wash.2d 1008 (1982), the court also dismissed DSI's constitutional taking claim.[5] The only remaining issue for trial was the amount of "measurable damages," which, in accordance with College Place, was to be based on the decrease in the value of the certificate due to the annexations.
After a bench trial, the court ruled that DSI's certificate was a property right that has value distinct from lost profit and awarded DSI "measurable damages" in the amount of $425,000. The judge found DSI's two expert witnesses persuasive on the appropriate methodology of calculating "measurable damages." Both experts testified that the current method for calculating damages is to multiply the EBDIT or EBITDA times a multiplier of 7.6. (EBDIT consists of *18 earnings before depreciation, interest and taxes, while EBITDA is earnings before interest, taxes, depreciation and amortization.) Both of DSI's experts' calculations included an estimate of future revenue minus saved expenses. The City's expert, on the other hand, testified that DSI did not incur any "measurable damages" since it had the benefit of the five-year franchise extensions, but the trial court found this testimony unpersuasive.[6]
The City appealed to Division Three of the Court of Appeals, which reversed the damage award and remanded for further proceedings. Dahl-Smyth, Inc. v. City of Walla Walla, 110 Wash.App. 26, 38 P.3d 366 (2002). The Court of Appeals accepted Dahl-Smyth's proposition that the hauler's certificate is a property right and that damages for cancellation by annexation are governed solely by RCW 35A.14.900. Id. at 34, 38 P.3d 366. The court then held that "measurable damages" meant only "those claims that are directly connected to the cancellation of the franchise and capable of exact measurement." Id. at 35, 38 P.3d 366. According to the court, such damages do not include lost profits or loss in value; rather, they are limited to "incidental and consequential damages proximately caused by the cancellation of the franchise." Id.
DSI appealed to this court and we granted review.

II

ANALYSIS
The single issue before this court is whether the Court of Appeals erred in its determination of what is to be included in a calculation of "measurable damages." Because we find that there is no indication in the statute that "measurable damages" must be capable of exact measurement nor any indication that "measurable damages" are limited to incidental and consequential damages, we reverse the Court of Appeals.
If a city annexes territory covered by a garbage hauler's certificate, the city may retain the hauler's service or choose to provide its own solid waste collection service. RCW 35.21.120. However, if the city takes over collection, RCW 35A.14.900 requires the city to compensate the holder of the certificate. Under RCW 35A.14.900, the city must choose one of three options. The city can: (1) purchase the franchise for a negotiated price, (2) condemn the franchise upon payment of damages, or (3) permit the franchisee to continue to serve the annexed territory for five years after annexation, at which point the city may then provide its own garbage collection service. Former RCW 35A.14.900 (1996). If the city chooses the third option, the city is liable for "any measurable damages as a result of any annexation...." Id.; see also Metropolitan, 32 Wash.App. at 719, 649 P.2d 642 (holding that "measurable damages" only apply if the city elects to grant the five-year franchise extension). The statute does not define "measurable damages."
There is very little authority in Washington case law on the meaning of the phrase "measurable damages." In Metropolitan, a garbage hauler sued the City of Spokane for damages to its franchise due to annexations.[7] 32 Wash.App. 714, 649 P.2d 642. The Court of Appeals found that Metropolitan's claim for "measurable damages" was statutory rather than constitutional, and was therefore barred by the statute of limitations. Id. at 719-20, 649 P.2d 642. Although Metropolitan's claim was barred, the Court of Appeals discussed the meaning of "measurable damages:" "[T]he franchisee who is granted a 5-year franchise after annexation has the right under the statute to seek damages for any loss sustained over and above the benefit derived from the franchise." Id. at 719, 649 P.2d 642 (emphasis added). Because the claim was time barred, the court did not elaborate on what such losses would include.
*19 In 1982, DSI brought suit under former RCW 35A.14.900 against the City of College Place after the city annexed some of its territory, arguing that "measurable damages" included lost profits and the decrease in value of the certificate. College Place, slip op at 3. The trial court refused to allow DSI to recover lost profits, limiting damages to the decrease in value of the certificate. Id. at 4. In an unpublished decision, the Court of Appeals found that "if the Legislature meant to limit damages to the loss in value of the certificate, it would have so stated, instead of using the phrase `any measurable damages.'" Id. at 5. The Court of Appeals nonetheless refused to award lost profits since they are based on estimated future earnings and costs, and are therefore not "capable of exact measurement." Id.

"Capable of Exact Measurement"
On appeal in this case, the Court of Appeals found, in accordance with the College Place ruling, that by using the word "measurable," the legislature intended to allow only those damages that were "capable of exact measurement." Dahl-Smyth, 110 Wash.App. at 35, 38 P.3d 366 (emphasis added). DSI's expert admitted at trial that his calculation of damages was "not subject to any kind of exact measurement, they are estimates at best." Report of Proceedings at 81. Apparently because loss in value cannot be measured exactly, the Court of Appeals concluded that "measurable damages" do not include the loss in value to the hauler's certificate. Dahl-Smyth, 110 Wash.App. at 34-35, 38 P.3d 366. The court cited Metropolitan, stating: "In effect, Dahl-Smyth requested and received as `measurable damages' the very damage award denied in Metropolitan: just compensation for the loss in value of its franchise." Id. at 34, 38 P.3d 366. However, Metropolitan does not prohibit the recovery of "measurable damages" for loss in value of the franchise. Rather, the Metropolitan court stated that the franchisee could seek damages for "any loss sustained over and above the benefit derived from the franchise." 32 Wash.App. at 719, 649 P.2d 642 (emphasis added).
"Measurable" is not defined in RCW 35A.14.900. When no statutory definition is provided, words in a statute should be given their common meaning, which may be determined by referring to a dictionary. Budget Rent A Car Corp. v. Dep't of Licensing, 144 Wash.2d 889, 899, 31 P.3d 1174 (2001). Webster's defines "measurable" as "capable of being measured," "great enough to be worth consideration: significant," and "of limited duration: not indefinite; foreseeable." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1399 (1971). Nowhere in Webster's definition does it state that "measurable" means "exact."
It seems unlikely that the legislature meant for "measurable damages" to be awarded only if capable of exact calculation, particularly as such precision is not required in the calculation of other types of damages awards. For example, in discussing a damages claim for lost profits, this court has stated: "It is not necessary that lost profits be susceptible of exact calculation. It is sufficient if there be data from which the profits can be ascertained with a reasonable degree of certainty and exactness." Cal. E. Airways, Inc. v. Alaska Airlines Inc., 38 Wash.2d 378, 380, 229 P.2d 540 (1951). See also 22 AM.JUR. 2d Damages § 486 (1988). Thus, we find it more likely that, as DSI argues, the legislature used the word "measurable" to indicate that damages must be capable of calculation by some accepted methodology.

Incidental and Consequential Damages
The Court of Appeals further limited "measurable damages" to incidental and consequential damages. Yet if the legislature had intended such a meaning, it could have included the terms "incidental" and "consequential" in the statute rather than using the term "measurable." The inclusion of one term as opposed to another in a statute implies that the legislature intended to exclude the other. In re Detention of Williams, 147 Wash.2d 476, 491, 55 P.3d 597 (2002). Thus, we determine that the use of the term "measurable damages" indicates that the legislature did not in fact mean incidental and consequential damages.

*20 Fair Market Value and Offset

DSI argues that the difference in the fair market value of its certificate before and after the annexations without any offset for the five-year extension is the appropriate way to calculate "measurable damages." The City, on the other hand, asserts that because fair market value is used to calculate damages in condemnation cases, it cannot also be used to assess the appropriate amount of "measurable damages." The City also contends that the amount of damages should be reduced by the benefit gained from the five-year franchise extensions.
This court routinely calculates damages by assessing fair market value in condemnation cases. See, e.g., Lange v. State, 86 Wash.2d 585, 547 P.2d 282 (1976); State v. Rowley, 74 Wash.2d 328, 444 P.2d 695 (1968); State v. Larson, 54 Wash.2d 86, 338 P.2d 135 (1959). However, condemnation is one of the other two choices that a city has under RCW 35A.14.900. Presumably, "measurable damages" has a separate and distinct meaning under the five-year extension option.
The court should not construe statutory language "`so as to result in absurd or strained consequences....'" In re Custody of Smith, 137 Wash.2d 1, 8, 969 P.2d 21 (1998) (quoting Duke v. Boyd, 133 Wash.2d 80, 87, 942 P.2d 351 (1997)). A statute should be read as a whole and the various provisions should be read in light of each other. Miller v. City of Tacoma, 138 Wash.2d 318, 338, 979 P.2d 429 (1999). Since condemnation is an alternative to the five-year extension plus "measurable damages" option, it is presumed to have an independent and distinct meaning. See Haley v. Highland, 142 Wash.2d 135, 147, 12 P.3d 119 (2000) (stating that a difference in meaning is presumed when the legislature uses different language at various points within the same statute). This distinction makes common sense. If "measurable damages" were assessed by calculating fair market value with no offset for the five-year extension, then no city would ever choose the five-year extension option. If it did, it would have to pay fair market value plus grant a five-year extension, whereas if it instead chose the condemnation option, it could simply pay fair market value with no extension. Thus, by reading the statute as a whole, we conclude that the legislature did not intend for "measurable damages" to equal the difference in the fair market value of the certificate before and after annexation without an offset.
In ascertaining the proper measure of damages, we look to other cases involving injury to property for guidance. This court has held that the proper measure of damages when property is permanently damaged is the difference between the value of the property before the injury and its value after the injury. Colella v. King County, 72 Wash.2d 386, 394, 433 P.2d 154 (1967); Drake v. Smith, 54 Wash.2d 57, 62, 337 P.2d 1059 (1959). See also 22 AM.JUR. 2d Damages § 405, at 490 (1988). Under this theory, however, because the five-year franchise extension also compensates the hauler for the loss of territory, we believe the award for diminution in value should be offset by the benefit gained by reason of the extension.
The Metropolitan decision supports this interpretation. The Metropolitan court stated that a garbage collection company that receives a five-year extension "has the right under the statute to seek damages for any loss sustained over and above the benefit derived from the franchise." 32 Wash.App. at 719, 649 P.2d 642 (emphasis added). Here, DSI enjoyed an extended five-year benefit because the City chose to grant it an extension rather than negotiating a purchase or condemning the franchise. In accordance with Metropolitan, DSI can seek damages for any loss that exceeds the benefit that it received from the five-year franchise extensions, but cannot claim both damages for the full loss in value of the certificate plus the benefit of the five-year extension.
The trial court found that the DSI certificate had "value unrelated to the 5 or 7 year continued service provision." Clerk's Papers at 1621. However, given that the other two options provided for by the legislature in RCW 35A.14.900 are a negotiated sale and condemnation, it is unlikely that any city would choose to grant the five-year extension if the legislature also meant for a city to pay damages without an offset for the benefit accrued during the five-year franchise extension. *21 Therefore, although it is appropriate to assess "measurable damages" based on the change in fair market value, such a damages award must be reduced by the amount of benefit gained from the franchise extension.

Lost Profits
The trial court ruled on summary judgment that DSI was collaterally estopped from claiming lost profits due to the College Place decision. The Court of Appeals agreed with the College Place court's reasoning, finding that lost profits were "too speculative to qualify as `measurable damages.'" Dahl-Smyth, 110 Wash.App. at 35, 38 P.3d 366. Despite its stated exclusion of lost profits, the trial court accepted the testimony of DSI's experts, who calculated the loss of the certificate's value by estimating DSI's future revenues minus future expenses from 1999 to 2009 for the annexed territory.[8] The City argues that this type of calculation results in recovery of lost profits.[9]
A commonly accepted method of determining the value of a business is to estimate its ability to generate future profits. CHARLES H. MEYER, ACCOUNTING AND FINANCE FOR LAWYERS 373 (1995). See also Business Valuation Methods, American Express Small Business 1 (2002), at http://home3.americanexpress.com/ smallbusiness//resources/starting/valbiz.shtml (last visited Nov. 4, 2002). Similarly, the value of an asset can be determined by evaluating the relationship between the profit that it generates and the cost of earning that profit. Samuel Greengard, Get a Grip on Assets, Business Finance Magazine 3 (Jan.2002), at http://www.bfmag.com/archives (last visited Nov. 4, 2002). See also EUGENE F. BRIGHAM, FUNDAMENTALS OF FINANCIAL MANAGEMENT 39 (7th ed. 1995) ("The value of an asset (or a whole firm) is determined by the cash flow it generates.").
A garbage collection certificate is an asset. It gives its possessor the right to generate profits. The greater the profit the certificate is expected to generate, the more valuable the certificate. Thus, an evaluation of the change in value to DSI's certificate necessarily includes a calculation of the profit that DSI could have expected to earn via the certificate.
Refusing to allow consideration of lost profits in assessing the value of a certificate would be prohibiting the use of a commonly accepted method of asset valuation. Thus, we hold that lost profits may be used to assess the value of a garbage collection company's certificate for the purpose of awarding "measurable damages."

Calculation at Time of Annexation
The City argues that because the certificate is cancelled at the time of annexation, the calculation of "measurable damages" should be based on rates and population counts existing at the time of annexation. DSI, on the other hand, used rates and customer counts existing at the time of trial to prepare its calculations of loss in value. The Court of Appeals found that "measurable damages" were "not necessarily fixed as of the annexation date." Dahl-Smyth, 110 Wash.App. at 35, 38 P.3d 366. Both of DSI's experts admitted that their calculations were based on 1999 customer counts and rates, despite the fact that the annexations occurred at various times between 1982 and 2000. Thus, the calculation of damages for some of the annexations was based on customer counts and rates that existed 17 years after the annexations took place.
*22 Former RCW 35A.14.900 provides for the automatic cancellation of the certificate at the time of annexation. RCW 35A.14.900. See also Fed. Way Disposal Co. v. City of Tacoma, 11 Wash.App. 894, 895, 527 P.2d 1387 (1974) (stating that annexation by a city cancels any garbage collection permit issued to a private company). Because cancellation occurs at annexation, the change in the fair market value must also be calculated based on data collected at that time. To do otherwise could result in an inflated measure of damages. As the city services manager testified at trial, annexation tends to increase the population density within the annexed territory because of the availability of city utilities. Thus, allowing damages to be calculated based on 1999 customer counts for annexations that occurred as far back as 1982 could lead to an inflated damage award.[10]
This court has previously held that damages to property should be calculated at the time of the injury.[11] In calculating damages for permanent injury to property, "`the general rule applicable is the difference between the market value of the property immediately before the damage and its market value immediately thereafter.'" Colella, 72 Wash.2d at 393, 433 P.2d 154 (quoting Harkoff v. Whatcom County, 40 Wash.2d 147, 152, 241 P.2d 932 (1952) (emphasis added)). See also 22 AM.JUR. 2d Damages § 407, at 492 (1988). The damage in this case is the annexation of the hauler's territory by a city, which results in the immediate cancellation of a hauler's certificate. Thus, we hold that the calculation of the difference in fair market value before and after annexation must be based on rates and population counts that exist at the time of annexation.

III

CONCLUSION
Under RCW 35A.14.900, "measurable damages" are to be calculated at the time of annexation by determining the difference in market value of the hauler's certificate before and after annexation. In determining an award, the amount of damages must then be reduced by the benefit gained by the hauler from the five-year extension of the franchise. We remand to the trial court for calculation of damages consistent with this opinion.
WE CONCUR: ALEXANDER, C.J., and JOHNSON, MADSEN, SANDERS, IRELAND, CHAMBERS, OWENS, JJ., and THOMPSON, J.P.T.
NOTES
[1] In 1997, the legislature amended the relevant portion of RCW 35A.14.900 to increase the extension period to seven years.
[2] The 1997 amendment to RCW 35A.14.900 requires the city to affirmatively notify the WUTC of its intent to operate its own solid waste collection service. Four of the annexations in this case occurred after 1997. However, neither party disputes that all of DSI's certificates were cancelled at the time of annexation.
[3] It is unclear from the record what caused the additional 12-year delay between the time that the Court of Appeals issued its College Place ruling and the City filed its answer. The trial judge found it to be the "result of mutual agreement." Clerk's Papers at 1208.
[4] RAP 10.4(h) prohibits a party from citing an unpublished opinion of the Court of Appeals as authority. Although both the trial court's decision and our opinion discuss the College Place ruling, we do not suggest that this or any other unpublished opinion should be relied on as precedent.
[5] Although this claim was dismissed on summary judgment by the trial court and was not raised before the Court of Appeals, DSI argues a constitutional taking claim in its petition to this court. DSI's Pet. for Review at 12. We do not address the issue here because this court is generally limited to issues presented to and decided by the Court of Appeals when reviewing decisions of that court. State v. Cunningham, 93 Wash.2d 823, 837, 613 P.2d 1139 (1980); Peoples Nat'l Bank of Wash. v. Peterson, 82 Wash.2d 822, 830, 514 P.2d 159 (1973).
[6] The court also refused to qualify the City's other witness as an expert because he lacked experience in valuing solid waste companies.
[7] Metropolitan was decided under RCW 35.13.280 rather than 35A.14.900. However, the relevant language in the two statutes is identical except that RCW 35.13.280 applies to "noncode" cities while RCW 35A.14.900 applies to "code" cities.
[8] Although it is not usually the function of this court to weigh the evidence presented to the trial court, this court may examine expert testimony to determine if it was "clearly grounded upon a fundamentally wrong basis." Doolittle v. City of Everett, 114 Wash.2d 88, 106, 786 P.2d 253 (1990). See also In re Appeal of Schmitz, 44 Wash.2d 429, 433, 268 P.2d 436 (1954). In Schmitz, this court commented that when evaluating the weight of expert opinion, "the opportunity of this court to study the exhibits, examine the figures, and consider the opinions of the experts is equal to that of the trial court." 44 Wash.2d at 433, 268 P.2d 436.
[9] Lost profits are normally calculated by subtracting the estimated cost of running a business from the estimated gross receipts. 22 AM.JUR. 2d Damages § 642, at 704 (1988). See also BLACK'S LAW DICTIONARY 1090 (5th ed.1979) (defining profit as "[e]xcess of revenues over expenses for a transaction").
[10] The same would be true to a lesser extent if we were to use numbers compiled at the end of the five-year extension period.
[11] Although this case does not involve a constitutional taking, it is instructive that damages for a taking are also assessed at the time of the taking rather than at the time of trial. See City of Medina v. Cook, 69 Wash.2d 574, 578, 418 P.2d 1020 (1966) ("The law is well settled that the measure of just compensation is the market value at the time of the taking."); 29A C.J.S. Eminent Domain § 172, at 426 (1992) ("[C]ompensation shall be determined as of the time of the taking....").