142 P.3d 193 (2006)
Alexander Nam RIOFTA, Appellant,
v.
STATE of Washington, Respondent.
Nos. 33539-5-II, 33262-1-II.
Court of Appeals of Washington, Division 2.
August 22, 2006.
*195 Jacqueline Mc Murtrie, UW Law Clinic-Innocence Project NW, Seattle, WA, for Appellant.
Michelle Luna-Green, Pierce County Prosecuting Attorney, Lisa Karen Wagner, Attorney at Law, Tacoma, WA, for Respondent.
VAN DEREN, A.C.J.
¶ 1 Alexander Nam Riofta was convicted for first degree assault with a firearm in November 2000.[1] Following conviction, Riofta filed unsuccessful requests with the Pierce County prosecutor and the attorney general under former RCW 10.73.170 (2001) for post-conviction DNA testing of a white hat worn by the shooter.
¶ 2 In March 2005, the legislature amended RCW 10.73.170[2] to broaden access to post-conviction DNA testing. Riofta (1) renewed his request for post-conviction DNA testing under amended RCW 10.73.170; and (2) filed a personal restraint petition (PRP), arguing that (a) he has a due process right to post-conviction DNA testing under the Fourteenth *196 Amendment of the United States Constitution; and (b) his trial counsel was ineffective for not requesting DNA testing of the white hat. The trial court denied Riofta's request under RCW 10.73.170. He appeals that denial. We consolidated Riofta's PRP and his direct appeal of the trial court's denial of his request for post-conviction DNA testing.[3] We affirm the trial court's denial of his statutory request for post-conviction DNA testing and deny his PRP.

FACTS
¶ 3 On July 5, 1998, five people were murdered and five were wounded at the Trang Dai Café in Tacoma. Eight people were arrested in connection with the incident, including Veasna Sok, whom the State charged with five counts of aggravated murder and five counts of first degree assault. Veasna Sok agreed to cooperate with the State and testify against his codefendants in exchange for a specific prison sentence. Although his codefendants, Jimmee Chea and Johnny Phet, retaliated and assaulted him in the courtroom, Veasna Sok continued to cooperate with the State.
¶ 4 Ratthana Sok is Veasna Sok's brother. At about 6:40 A.M. on January 27, 2000, 17-year-old Sok[4] walked out of his garage on his way to school. It was dark and foggy outside, but the area in front of Sok's house was lit by a streetlight and a house light over the garage. When Sok walked out of his garage, he noticed two or three individuals in an unfamiliar vehicle parked on the street to the right of his driveway. One of the passengers exited the vehicle, approached Sok, and asked him for a cigarette. Sok responded that he did not smoke and continued walking through the gate of his driveway. The individual  who wore a black jacket and white hat  then pulled a chrome revolver from his pocket and pointed it at Sok's forehead from two or three feet away. Sok turned and ran toward his house as the individual fired four or five shots, all of which missed Sok. Sok did not see the person flee, but the vehicle was gone when Sok's mother called the police.
¶ 5 Police found the shooter's white hat on the sidewalk near the driveway. The only other physical evidence at the scene was a spent bullet shell and bullet holes in Sok's garage and in his parents' cars. The hat and the bullet shell were never tested for fingerprints or DNA.
¶ 6 Two days later, police recovered a stolen vehicle a few blocks from Riofta's residence that was similar to the one Sok saw near his driveway.[5] The vehicle's owner testified that the car had been stolen late January 26 or early January 27, 2000, and that there was a white hat in the car when it was stolen. He also testified that the hat was missing when the vehicle was recovered and that the white hat found on Sok's sidewalk was the one he had left in the vehicle.
¶ 7 Immediately after the shooting, Sok told police that he recognized the shooter as someone who "looked like Alex," a 5'2" or 5'3", 125-130 pound male. In a second interview and at trial, Sok stated more definitively that the shooter's name was "Alex" and described him as a 17 or 18 year-old Asian male with a light build, shaved head, and a moustache. At trial, Sok admitted that he had not seen the shooter's head because the shooter was wearing a white hat but that he knew "Alex" had a shaved head because his father had seen him in the neighborhood the morning before the shooting. Sok also testified at trial that "Alex" was an acquaintance with whom he had played basketball four or five years before the shooting.
¶ 8 Police conducted an identification procedure using a database containing thousands of photographs. They searched the database using the terms "Alex," Asian, and male. The search produced 12 photographs of five different people, none of whom Sok identified as the shooter. Police then modified *197 the search to use the name "Alexander" rather than "Alex." This search produced 24 photographs of seven different people. Sok identified Riofta as the shooter from the second batch of photographs, stating, "That's him right there, I'm positive." Report of Proceedings (1RP) at 248-49.[6]
¶ 9 Police arrested Riofta at his home on January 28, 2000. When advised that he was under arrest for a shooting that had occurred the day before, Riofta angrily yelled, "I didn't shoot no mother fucker yesterday. I was here drinking all night. I worked yesterday from-at The News Tribune from 1:00 to 5:30. I don't even own no gun, how could I shoot some mother fucker?" 1RP at 250-51.
¶ 10 During a custodial interrogation after waiving his Miranda[7] rights, Riofta denied any involvement in the shooting. He explained that he had been drinking with friends the night before the shooting, that he left his house at about 11:00 A.M. the day of the shooting, that he worked from 1:00 P.M. to 5:30 P.M. conducting sales for The News Tribune, and that, after getting a beer with a coworker, he went home at 8:30 or 9:00 P.M.[8] He stated, "If I had shot at someone, I would kill them. I am not stupid enough to get identified." 1RP at 254. Without elaboration, he further stated that his arrest was a "bullshit conspiracy" and that Sok probably identified him because he walked up and down Sok's street everyday. Riofta also admitted that he had visited Sok's brother, Veasna, at Sok's house before Veasna was arrested and that, "Veasna was a sucker for snitching on the [h]omeys, and that he deserved to get choked up in court for snitching on [Jimmee Chea]." 1RP at 255. Riofta had a copy of a newspaper article depicting all the "homeys" (the Trang Dai defendants) at his house. He also told police that he used to hang out with another Trang Dai defendant, Sarun "Chewy" Ngeth, but that he stopped hanging out with him because Ngeth had a reputation for shooting people.
¶ 11 The State charged Riofta with first degree assault with a firearm on January 31, 2000. State v. Riofta, 118 Wash.App. 1025 at *1-*2, 2003 Wash.App. LEXIS 1880 at *5. A trial was held on November 27-30, 2000. The jury returned a guilty verdict on November 30, 2000.
¶ 12 On April 26, 2001, Riofta moved to vacate his conviction, asserting that he was incompetent at the time of trial and that his trial counsel was ineffective because he did not request a mental health evaluation or obtain the services of an eyewitness expert. Riofta, 118 Wash.App. 1025 at *3, 2003 Wash.App. LEXIS 1880 at *10. The trial court denied the motion, ruling that Riofta was competent at his trial and that his trial counsel had provided effective assistance. Riofta, 118 Wash.App. 1025 at *4, 2003 Wash.App. LEXIS 1880 at *13. Riofta appealed, arguing among other things that his trial counsel was ineffective because his trial counsel (1) failed to raise the issue of his competency before trial; and (2) failed to retain and present an expert on eyewitness testimony. Riofta, 118 Wash.App. 1025 at *7-*8, 2003 Wash.App. LEXIS 1880 at *27-*30. In an unpublished opinion filed on September 2, 2003, we affirmed Riofta's conviction. Riofta, 118 Wash.App. 1025 at *8, 2003 Wash.App. LEXIS 1880 at *30.
¶ 13 In late May 2002, while the appeal was pending, Riofta requested post-conviction DNA testing of the white hat under former RCW 10.73.170. During this request process, Kristi Minchau, Jimmee Chea's defense attorney, wrote a letter to the Attorney *198 General in which she stated that Chea, whom she found to be trustworthy, told her who shot at Sok and why Sok lied about the shooter's identity. She stated that she could not reveal the shooter's name but knew that he had a prior conviction in Washington and that his DNA should be on file with the State. Both the Pierce County Prosecutor's Office and the Washington State Attorney General's Office denied Riofta's request.
¶ 14 Then, in March 2005, the Washington Legislature amended RCW 10.73.170, broadening access to post-conviction DNA testing. Laws of 2005, ch. 5, § 1. The current version requires convicted felons to file a motion in the superior court where they were convicted (as opposed to the prosecutor's office) and to meet several procedural and substantive requirements to qualify for post-conviction DNA testing. See RCW 10.73.170. Riofta renewed his request for post-conviction DNA testing of the white hat under the current version of RCW 10.73.170 by filing a motion with the superior court in May 2005. The trial court denied Riofta's renewed request for post-conviction DNA testing.
¶ 15 Riofta appeals the trial court's denial of his second request. In his PRP, Riofta raises three constitutional issues in addition to his fourth constitutional claim that his trial counsel was ineffective because he failed to request DNA testing at trial.

ANALYSIS

I. DIRECT APPEAL  POST-CONVICTION DNA TESTING UNDER RCW 10.73.170
¶ 16 Riofta appeals the trial court's denial of his request for post-conviction DNA testing of the white hat under RCW 10.73.170. Riofta argues that (1) RCW 10.73.170's legislative history indicates the legislature's desire to broaden access to post-conviction DNA testing and supports his request for DNA testing here; (2) his request should be considered in light of weaknesses in the State's case; (3) DNA testing of the white hat will provide "significant new information," specifically, who wore or did not wear the white hat; and (4) an absence of his DNA on the hat in conjunction with DNA matching that of a convicted felon in Washington's felony DNA database would establish his innocence on a "more probable than not" basis under RCW 10.73.170(3).[9]
¶ 17 The State responds that (1) nothing in RCW 10.73.170 requires a court to consider Riofta's request in light of alleged weaknesses in the State's case; (2) DNA testing would not provide "significant new information" because the white hat and comparable DNA testing were available at trial; and (3) Riofta has not shown a likelihood that DNA testing will demonstrate his innocence on a "more probable than not" basis under RCW 10.73.170(3).

A. Standard of Review
¶ 18 The parties disagree whether the standard of review in this case is de novo or abuse of discretion. Because this case involves the interpretation and application of a statute to a set of facts, it is a matter of law we review de novo. State v. Law, 110 Wash. App. 36, 39, 38 P.3d 374 (2002); New W. Fisheries, Inc. v. Dep't of Revenue, 106 Wash.App. 370, 375, 22 P.3d 1274 (2001).

B. Statutory Interpretation
¶ 19 In construing a statute, our objective is to ascertain and give effect to the legislature's intent. State v. Jacobs, 154 Wash.2d 596, 600, 115 P.3d 281 (2005). Where a statute uses plain language and defines essential terms, the statute is unambiguous. City of Olympia v. Bd. of Comm'rs, 131 Wash.App. 85, 93, 125 P.3d 997 (2005).
¶ 20 If the statute is clear and unambiguous, we may not look beyond the statute's plain language or consider legislative history but should glean the legislative intent through the plain meaning of the statute's language. Burton v. Lehman, 153 Wash.2d 416, 422, 103 P.3d 1230 (2005); C.J.C. v. Corp. of Catholic Bishop, 138 Wash.2d 699, 708, 985 P.2d 262 (1999). When a statute's *199 plain meaning is clear from its unambiguous language, we must apply the statute as written. Enterprise Leasing v. City of Tacoma, Fin. Dep't, 139 Wash.2d 546, 552, 988 P.2d 961 (1999).
¶ 21 But if a statute is subject to more than one reasonable interpretation, it is ambiguous. Jacobs, 154 Wash.2d at 600-01, 115 P.3d 281. When a statute is ambiguous, we will resort to principles of statutory construction, legislative history, and relevant case law to assist in interpretation. Yousoufian v. King County Executive, 152 Wash.2d 421, 434, 98 P.3d 463 (2004). Moreover, if a statute is ambiguous, the rule of lenity requires us to interpret the statute in favor of the defendant absent legislative intent to the contrary. Jacobs, 154 Wash.2d at 601, 115 P.3d 281.

C. RCW 10.73.170
¶ 22 RCW 10.73.170, amended in March 2005, states that a convicted felon currently serving a prison sentence may file a motion requesting DNA testing with the court that entered the judgment on conviction. RCW 10.73.170(1). The person requesting DNA testing under RCW 10.73.170 must satisfy both procedural and substantive requirements. RCW 10.73.170(2) and (3).
¶ 23 RCW 10.73.170 states:
(2) The motion shall:
(a) State that:
(i) The court ruled that DNA testing did not meet acceptable scientific standards; or
(ii) DNA testing technology was not sufficiently developed to test the DNA evidence in the case; or
(iii) The DNA testing now requested would be significantly more accurate than prior DNA testing or would provide significant new information;
(b) Explain why DNA evidence is material to the identity of the perpetrator of, or accomplice to, the crime, or to sentence enhancement; and
(c) Comply with all other procedural requirements established by court rule.
(3) The court shall grant a motion requesting DNA testing under this section if such motion is in the form required by subsection (2) of this section, and the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.
RCW 10.73.170(2) and (3).
¶ 24 Here, there is no dispute that RCW 10.73.170(2)(a)(i) and (ii) are not at issue. RCW 10.73.170(2)(a)(iii) and (b) are procedural requirements relating to the motion's content. RCW 10.73.170(2)(a)(iii) requires the person requesting testing to state that "[t]he DNA testing now requested would be significantly more accurate than prior DNA testing or would provide significant new information." (Emphasis added.) We presume that the word "or" does not mean "and" and that a statute's use of the word "or" is disjunctive to separate phrases unless there is a clear legislative intent to the contrary. HJS Dev., Inc. v. Pierce County, 148 Wash.2d 451, 473 n. 95, 61 P.3d 1141 (2003); State v. Weed, 91 Wash.App. 810, 813, 959 P.2d 1182 (1998). Moreover, the phrase "than prior DNA testing" modifies only the antecedent phrase "would be significantly more accurate" and does not modify the phrase "would provide significant new information." RCW 10.73.170(2)(a)(iii); see also In re Welfare of A.T., 109 Wash.App. 709, 714, 34 P.3d 1246 (2001) (where no contrary intention appears in a statute, relative and qualifying words and phrases, both grammatically and legally, refer to the last antecedent). Thus, RCW 10.73.170(2)(a)(iii) requires that a motion requesting post-conviction DNA testing state that either the requested testing would be significantly more accurate than prior DNA testing or that it would provide significant new information.
¶ 25 Here, Riofta's motion states that DNA testing "would provide significant new information;" therefore, he technically satisfies RCW 10.73.170(2)(a)(iii). But Riofta admits that the white hat is not newly discovered evidence and that DNA testing will reveal only information that was available at trial, including the potential identity of a person whose DNA profile may be among convicted felons in Washington. Thus, the key issue *200 here is whether the testing would provide "new" information.
¶ 26 Because the legislature does not define "new," we give it its plain and ordinary meaning. United States v. Hoffman, 154 Wash.2d 730, 741, 116 P.3d 999 (2005). "New" means "having existed ... but a short time," "having originated or occurred lately," "recent, fresh," "having been seen or known but a short time although perhaps existing before." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1522 (2002). Black's Law Dictionary defines "new" as "recently come into being" or "recently discovered." BLACK'S LAW DICTIONARY 1068 (8th ed.2004).
¶ 27 The information that post-conviction testing of the white hat might uncover does not meet any of these definitions. Thus, there is nothing "new" about the white hat or any information that it may contain. DNA testing of comparable accuracy was available at trial. Because Riofta chose not to test the white hat at trial does not mean that any information discoverable through post-conviction testing is now "new."
¶ 28 If the only requirement for post-conviction DNA testing is that a convicted person simply state that requested DNA testing "would provide significant new information," then the legislature created only an illusory procedural burden under RCW 10.73.170(2)(a)(iii). Applying such a literal interpretation of the provision would render the phrase "would provide significant new information" effectively meaningless in light of undisputed evidence and Riofta's admissions that the white hat, and any information that could be obtained by testing it, was available at trial. We avoid construing a statute in a manner that renders a provision meaningless. State v. Contreras, 124 Wash.2d 741, 747, 880 P.2d 1000 (1994).
¶ 29 Moreover, we read statutes as a whole and consider various statutory provisions in light of each other. Dahl-Smyth, Inc. v. Walla Walla, 148 Wash.2d 835, 844, 64 P.3d 15 (2003). When we apply this principle and read RCW 10.73.170(2)(a)(iii) in conjunction with the other provisions of RCW 10.73.170(2)(a), it is clear that the legislature did not intend that a convicted person be able to obtain post-conviction DNA testing merely by stating that DNA testing would provide significant new information when it is undisputed and the person acknowledges in other pleadings that all information that may result from current testing was available at trial through testing of equal accuracy. RCW 10.73.170(2)(a)(i), (ii), and the first half of (iii) clearly indicate that the information to allegedly be gathered through post-conviction DNA testing was unavailable at trial. These provisions allow for post-conviction DNA testing, so long as the substantive requirement of RCW 10.73.170(3) is satisfied, when (1) the trial court ruled that DNA testing did not meet scientific standards acceptable at the time of trial; (2) DNA testing technology was not sufficiently developed at the time of trial to test the evidence at issue; or (3) the DNA testing conducted at trial was significantly less accurate than the DNA testing currently available. RCW 10.73.170(2)(a)(i)(iii).
¶ 30 Given the thrust of RCW 10.73.170(2)(a)'s other provisions, a strained consequence results if we were to assign the hyper-literal interpretation Riofta urges, allowing a defendant to take a "wait and see" position on DNA testing by trying to gain acquittal without the DNA information but, following conviction, moving to test the DNA. We will not assign meaning to statutory language if it results in absurd or strained consequences. Dahl-Smyth, 148 Wash.2d at 844, 64 P.3d 15.
¶ 31 Accordingly, we hold that the legislature intended that a party requesting DNA testing under the second half of RCW 10.73.170(2)(a)(iii) must state that the testing "would provide significant new information" unavailable at trial. If a person requests DNA testing of evidence available at trial, information that the same or comparable testing might reveal post-conviction is not "new" under RCW 10.73.170(2)(a)(iii).
¶ 32 In addition to the procedural requirements under RCW 10.73.170(2)(a), the post-conviction DNA testing request must also explain why DNA evidence is material to the identity of the perpetrator. RCW 10.73.170(2)(b). Riofta argues that DNA test *201 results from the white hat are material to the identity of the shooter because, according to Jimmee Chea's defense attorney, they may match that of a convicted felon in Washington's DNA database. But DNA testing may show only who wore the hat after the car was stolen. DNA testing will not resolve who wore the hat during the shooting. Thus, we conclude that the trial court did not err in finding that RCW 10.73.170(2) was not satisfied and in refusing to order DNA testing.
¶ 33 Moreover, even if Riofta satisfied RCW 10.73.170(2)'s procedural requirements, he does not satisfy the substantive requirement under RCW 10.73.170(3). That provision states in relevant part that "[t]he court shall grant a motion requesting DNA testing under this section if ... the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3). Riofta does not meet this substantive requirement for the same reason he does not satisfy RCW 10.73.170(2)(b). DNA evidence from the hat will not demonstrate either his innocence on a more probable than not basis or the identity of the shooter. Even if Riofta obtains the DNA test results he seeks  an absence of his DNA in conjunction with a match of the DNA of a convicted felon in Washington, the results do not exonerate Riofta. Two or three people waited in the shooter's car. More than one person in the car may have worn the hat. Riofta has not satisfied RCW 10.73.170(3)[10] and the trial court did not err in refusing to grant his request for post-conviction DNA testing of the white hat.

II. PERSONAL RESTRAINT PETITION
¶ 34 We address three constitutional issues Riofta raises in his PRP as well as his claim of ineffective assistance of counsel. First, he contends that Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), establishes that the principle of fundamental fairness under the Fourteenth Amendment's due process clause requires access to post-conviction DNA testing. Second, Riofta relies on Osborne v. State, 110 P.3d 986 (Alaska Ct.App.2005), to argue that he has a general due process right to post-conviction DNA testing under certain circumstances. Third, he argues that denial of post-conviction DNA testing constitutes a denial of his Sixth Amendment right to compulsory process because he is unable to present a viable defense to the charges. Finally, Riofta claims that his trial counsel was ineffective because he did not request DNA testing of the white hat found at the crime scene.[11]

A. Standard of Review
¶ 35 We have original jurisdiction in PRP proceedings in which the death penalty has not been decreed. RAP 16.3(c). We grant appropriate relief if the petitioner is under a "restraint" as defined under RAP 16.4(b)[12] and the petitioner's restraint is unlawful for one or more of the reasons defined in RAP 16.4(c). RAP 16.4(a). The arguably applicable reasons under RAP 16.4(c) in Riofta's case are:
....
(3) Material facts exist which have not been previously presented and heard, which in the interest of justice require vacation of the conviction, sentence, or other order entered in a criminal proceeding or civil proceeding instituted by the state or local government; or
....
(5) Other grounds exist for a collateral attack upon a judgment in a criminal proceeding or civil proceeding instituted by the state or local government;

*202 ....
RAP 16.4(c).
¶ 36 In addition to the eligibility requirements for PRPs, we limit the availability of collateral relief because it undermines the principles of finality of litigation, degrades the prominence of trial, and at times deprives society of the right to punish admitted offenders. In re Pers. Restraint of Davis, 152 Wash.2d 647, 670, 101 P.3d 1 (2004). As a general rule, PRPs may not simply reiterate issues finally resolved at trial and on direct review, but rather, must raise new points of fact and law that were not or could not have been raised in the principal action, to the prejudice of the defendant. Davis, 152 Wash.2d at 670-71, 101 P.3d 1. The petitioner may not renew an issue raised and rejected on direct appeal unless the interests of justice require relitigation of that issue. Davis, 152 Wash.2d at 671, 101 P.3d 1.
¶ 37 A petitioner may, however, collaterally challenge his conviction and sentence by raising genuinely new issues, whether constitutional or non-constitutional. Davis, 152 Wash.2d at 671, 101 P.3d 1. To obtain relief based on a constitutional error, the petitioner must demonstrate by a preponderance of the evidence that he was actually and substantially prejudiced by the error. Davis, 152 Wash.2d at 671-72, 101 P.3d 1. Under limited circumstances the petitioner's burden to establish actual and substantial prejudice may be waived when the error results in a conclusive presumption of prejudice. Davis, 152 Wash.2d at 672, 101 P.3d 1.
¶ 38 Non-constitutional errors, in contrast, require more than a mere showing of prejudice. Davis, 152 Wash.2d at 672, 101 P.3d 1. We consider non-constitutional errors only when they constitute a fundamental defect that inherently results in a complete miscarriage of justice. Davis, 152 Wash.2d at 672, 101 P.3d 1.

B. Brady Due Process Claim
¶ 39 Citing decisions from other states,[13] Riofta argues that Brady and its progeny establish that fundamental fairness under the due process clause requires access to post-conviction DNA testing even when the defendant did not request it at the time of trial.
¶ 40 The State responds that there is no post-conviction Brady due process right to DNA testing.[14] We agree with the State.
¶ 41 In In re Pers. Restraint of Gentry, 137 Wash.2d 378, 396, 972 P.2d 1250 (1999), our Supreme Court explained that due process requires the State to disclose evidence that is both favorable to the accused and material to either guilt or punishment. But there is no Brady violation if the defendant, using reasonable diligence, could have obtained the information at issue. Gentry, 137 Wash.2d at 396, 972 P.2d 1250 (quoting In re Pers. Restraint of Benn, 134 Wash.2d 868, 916, 952 P.2d 116 (1998)). Here, Riofta had access to the white hat before and during trial and could have submitted it for DNA testing at that time. The State did not fail to disclose the white hat or prevent Riofta from seeking DNA testing. Thus, there is no Brady violation.
*203 ¶ 42 Citing Thomas v. Goldsmith, 979 F.2d 746 (9th Cir.1992), Riofta suggests that the State's Brady obligation to produce exculpatory evidence post-conviction applies here. Riofta is incorrect. In Goldsmith, the 9th Circuit Court of Appeals explained that the State has a continuing obligation under Brady to provide exculpatory evidence after trial that is relevant to an instant habeas corpus proceeding. In Goldsmith, the State suppressed exculpatory semen evidence at trial and continued to withhold it during the subsequent habeas corpus proceeding. Goldsmith, 979 F.2d at 749-50. But here, the State disclosed the white hat and did not prevent Riofta from seeking DNA testing.
¶ 43 Riofta also asserts that the overall weakness of the State's case requires post-conviction DNA testing of the white hat. Riofta cites only State v. Thomas, 245 N.J.Super. 428, 586 A.2d 250 (App.Div.1991), in support of this contention. In Thomas, the court suggested that where the State's case is weak and based largely on eyewitness identification, defendants should have access to post-conviction DNA testing if they were improperly denied access to it at trial. See 586 A.2d at 251-54.
¶ 44 Here, Riofta was not improperly denied access to DNA testing at trial; both the hat and DNA testing were readily available at trial. Further, as we discuss later, Riofta's attorney was effective and likely made a tactical decision to forego DNA testing of the white hat. Moreover, DNA testing was not widely accepted and was expensive at the time of the Thomas defendant's trial; thus, his situation is distinguishable from Riofta's where DNA testing was common and available. See Thomas, 586 A.2d at 251-53. Finally, we will not weigh the strength of the State's case post-conviction, particularly the accuracy of Sok's eyewitness testimony, because we must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Thomas, 150 Wash.2d 821, 874-75, 83 P.3d 970 (2004).
¶ 45 Riofta has suffered no Brady violation.

C. General Due Process Claim
¶ 46 Although Riofta never expressly argues that he has a general due process right to post-conviction DNA testing, his application of the three-part test adopted by the Alaska Court of Appeals in Osborne v. State, 110 P.3d 986, 995 (Alaska Ct.App.2005), implies that such a right exists. Riofta's lengthy discussion of Osborne and his argument that Osborne's holding must apply to his case raise the issue of whether Riofta has a post-conviction due process right to DNA testing if he satisfies the three-part test adopted in Alaska and other states.
¶ 47 In Osborne, the Alaska Court of Appeals held that although (1) the defendant did not have a due process right under the federal constitution to present new evidence to establish his factual innocence; (2) relevant Alaska statutory law likely precluded post-conviction DNA testing of physical evidence available at trial; and (3) it had already rejected the defendant's claim that his trial counsel was ineffective because counsel did not request more discriminating DNA testing, the defendant could nevertheless obtain post-conviction DNA testing if he satisfied a three-part test adopted in other states. Osborne, 110 P.3d at 992, 995. That test requires that a defendant seeking post-conviction DNA testing must, at a minimum, show that (1) the conviction rested primarily on eyewitness identification evidence; (2) there was a demonstrable doubt concerning the defendant's identification as the perpetrator; and (3) scientific testing would likely be conclusive on that issue. Osborne, 110 P.3d at 995.
¶ 48 Although Washington courts have not adopted a version of the three-part Osborne test, our Supreme Court favorably referred to a three-part test in Gentry regarding post-trial discovery. 137 Wash.2d at 392, 972 P.2d 1250. In Gentry, the defendant filed several post-conviction motions for discovery, requesting, among other things, documents, depositions of various county prosecutors, and the appointment of an investigator and an expert. 137 Wash.2d at 390, 972 P.2d 1250. In rejecting the defendant's discovery requests, the Court explained:

*204 There are few published decisions involving requests for appointment of investigators or experts in connection with postconviction proceedings. Two courts have held that an expert should be appointed to perform DNA testing if the defendant consistently maintained his innocence, the victim's identification testimony was challenged, and the testing could conclusively prove the defendant's innocence. Jones v. Wood, 114 F.3d 1002, 1009 (9th Cir.1997); Commonwealth v. Reese, 444 Pa.Super. 38, 663 A.2d 206, 208-09 (1995). But none of these cases authorize either discovery such as depositions, or the appointment of investigators or experts to identify or develop grounds for challenging convictions or sentences. They merely allow the defendant to interview known witnesses or to obtain or test existing evidence in the government's possession. They also require a showing there is reason to believe a specific discovery request will support a particular, identified claim for relief.
Gentry, 137 Wash.2d at 392, 972 P.2d 1250.
¶ 49 We conclude that Riofta cannot satisfy the critical requirement of demonstrating that DNA testing of the white hat would conclusively, or even likely, prove his innocence. The absence of Riofta's DNA on the white hat does not necessarily indicate that Riofta was not the shooter because Riofta may not have transferred his DNA to the hat. For example, evidence indicates that the shooter could have worn the hat for only a relatively short period of time because the car in which the hat was located was stolen within twelve hours of the shooting. Moreover, the presence of someone else's DNA (other than the hat's owner who testified at trial) does not exonerate Riofta because Riofta and other persons could have worn the hat without all of them transferring DNA. At best, DNA testing might raise an interesting question in light of Jimmee Chea's attorney's letter about statements Chea made about Riofta's innocence. But even if DNA on the white hat matched that of a particular convicted felon in Washington, it does not conclusively establish Riofta's innocence given the number of persons Sok saw in the car who may have worn the hat.

D. Sixth Amendment Claim
¶ 50 Riofta also argues that by prohibiting access to post-conviction DNA testing of the white hat, the State is denying him an opportunity to present a viable defense to the charges against him, thus stripping him of his Sixth Amendment right to compulsory process under the United States Constitution. The State responds that Riofta was afforded due process at trial, that he had ample opportunity to test the white hat for DNA at that time, and that he has no constitutional right to post-conviction discovery.
¶ 51 The State is correct; it did not deny Riofta an opportunity to present a defense to the crime charged. Indeed, Riofta had a jury trial, during which he had the opportunity to defend against the crime charged by presenting evidence, including any favorable information from DNA testing of the white hat. Riofta's citations in support of his compulsory process contention are inapposite. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), and Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), deal with situations in which defendants were improperly prohibited from presenting certain witness testimony at trial. And Riofta does not assert that he was prevented from presenting DNA evidence from the white hat at trial.

E. Ineffective Assistance of Counsel
¶ 52 Finally, Riofta argues that his trial counsel was ineffective because he did not subject the white hat to DNA testing before or during trial. Riofta attempts to bolster his contention by claiming that his trial counsel failed even to consider DNA testing of the white hat. The State responds that there were legitimate tactical reasons supporting a decision not to seek DNA testing of the white hat at trial.
¶ 53 Effective assistance of counsel is guaranteed under the federal and state constitutions. See U.S. CONST. amend VI; WASH. CONST. art. I, § 22. To prove ineffective assistance of counsel, an appellant must show that counsel's performance was deficient and that the deficient performance prejudiced him. In re Pers. Restraint of Woods, 154 *205 Wash.2d 400, 420-21, 114 P.3d 607 (2005). A failure to establish either element of the test defeats an ineffective assistance of counsel claim. Davis, 152 Wash.2d at 673, 101 P.3d 1.
¶ 54 Counsel's performance is deficient when it falls below an objective standard of reasonableness. State v. Stenson, 132 Wash.2d 668, 705, 940 P.2d 1239 (1997). We afford great deference to trial counsel's performance and begin our analysis with a strong presumption that counsel was effective and that counsel's conduct fell within the wide range of reasonable professional assistance. Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. McFarland, 127 Wash.2d 322, 335, 899 P.2d 1251 (1995). We evaluate the reasonableness of counsel's performance from counsel's perspective at the time of the alleged error and in light of all the circumstances. Davis, 152 Wash.2d at 673, 101 P.3d 1. Further, we defer to an attorney's strategic decisions to pursue, or to forego, particular lines of defense when those strategic decisions are reasonable given the totality of the circumstances. Strickland, 466 U.S. at 689-91, 104 S.Ct. 2052. If reasonable under the circumstances, trial counsel need not investigate lines of defense that he has chosen not to employ. Strickland, 466 U.S. at 691, 104 S.Ct. 2052. But a lawyer who fails to adequately investigate and introduce evidence that demonstrates his client's factual innocence, or that raises sufficient doubt that undermines confidence in the verdict, renders deficient performance. Avila v. Galaza, 297 F.3d 911, 919 (9th Cir.2002).
¶ 55 Prejudice occurs when, but for the deficient performance, there is a reasonable probability that the outcome would have differed. In re Pers. Restraint of Pirtle, 136 Wash.2d 467, 487, 965 P.2d 593 (1998).
¶ 56 Riofta cites two aging, out-of-state cases to support his ineffective assistance of counsel claim. He argues that in State v. Thomas, 245 N.J.Super. 428, 586 A.2d 250 (App.Div.1991), and State v. Hicks, 195 Wis.2d 620, 536 N.W.2d 487 (1995), courts held that a defense attorney's failure to seek DNA testing of physical evidence constituted deficient performance falling below an objective standard of reasonableness, even if the failure was a tactical decision. Riofta's argument fails.
¶ 57 In Hicks, the Wisconsin Court of Appeals itself acknowledged that it did "not intend to suggest that failure to obtain DNA test results is always deficient performance." Hicks, 536 N.W.2d at 492. The court in Thomas effectively second-guessed the trial counsel's tactical decision not to seek DNA testing after it acknowledged that trial counsel's decision was reasonable. Thomas, 586 A.2d at 252. Because the State's case in Thomas was weak, and because the identifications in Thomas were uncorroborated except for each other, the court explained that:
[T]he defense, based on defendant's inability to drive a car and his apparent presence at work in Irvington at the time the assailant was seen in Newark, appeared sufficient in the circumstances to raise a reasonable doubt as to his guilt. Defense counsel may well have believed his client would be acquitted without incurring either the risk or expense of perhaps inadmissible DNA testing.
Thomas, 586 A.2d at 252. But in Washington, legitimate trial tactics are within trial counsel's province and cannot be the basis for an ineffective assistance of counsel claim. State v. McNeal, 145 Wash.2d 352, 362, 37 P.3d 280 (2002); State v. Benn, 120 Wash.2d 631, 665, 845 P.2d 289 (1993). Finally, neither case is binding authority on this court. See State v. Salavea, 151 Wash.2d 133, 144 n. 9, 86 P.3d 125 (2004); State v. Gonzales-Morales, 138 Wash.2d 374, 382, 979 P.2d 826 (1999).
¶ 58 Riofta argues that his trial counsel did not consider DNA testing of the white hat, relying primarily on a declaration Riofta's trial counsel submitted and which was filed with Riofta's PRP. But Riofta's trial counsel does not state that he did not consider DNA testing. Rather, he states only that he would have sought DNA testing had he possessed Minchau's post-conviction letter regarding Jimmee Chea's statements that Riofta was not the shooter and that the shooter was a convicted felon in Washington. This declaration does not imply that Riofta's trial counsel *206 did not consider DNA testing; if anything, it implies that he did consider it but deliberately chose not to seek it for tactical reasons. And beyond the assertions of an appellate attorney who represented Riofta during his first request for post-conviction DNA testing in 2002, nothing in the record suggests that Riofta's trial counsel failed to consider DNA testing. Riofta also attached the declaration of attorney Mark Prothero to his PRP. Prothero's opinion that it was objectively unreasonable for Riofta's trial counsel not to request DNA testing is not helpful in analyzing whether Riofta's trial counsel was ineffective. What one defense attorney may find strategically sound another may find lackluster.
¶ 59 Here, the State is correct that legitimate tactical reasons support Riofta's trial counsel's decision to forego DNA testing of the white hat. Specifically, given (1) Riofta's association with the Trang Dai defendants and with Sok's brother, Veasna; (2) Riofta's inflammatory statements regarding Veasna and favorable statements toward other Trang Dai defendants;[15] and (3) Sok's confident eyewitness identification of Riofta as the shooter,[16] Riofta's trial counsel likely feared that Riofta's DNA would be discovered on the white hat, effectively ending the case and inculpating Riofta beyond a reasonable doubt.
¶ 60 Riofta also contends that if his trial counsel's failure to request DNA testing was not ineffective assistance, then his trial counsel's other alleged errors, when considered in conjunction with his failure to request DNA testing, cumulatively amounted to ineffective assistance. In particular, Riofta argues that his trial counsel (1) failed to raise his competency as an issue despite evidence that he may have been incompetent; and (2) failed to secure an eyewitness expert.
¶ 61 But we specifically rejected these claims in State v. Riofta, 118 Wash.App. 1025, 2003 Wash.App. LEXIS 1880. PRPs may not reiterate issues finally resolved on direct review and may not renew issues raised and rejected on direct appeal unless the interests of justice require relitigation of that issue. Davis, 152 Wash.2d at 670-71, 101 P.3d 1. Raising a new basis for an ineffective assistance of counsel claim, as Riofta does here, does not warrant reconsideration of bases already addressed.
¶ 62 Under the circumstances of this case, trial counsel's decision not to seek DNA testing of the white hat can be characterized as a legitimate trial tactic and thus cannot be the basis for Riofta's ineffective assistance of counsel claim. And because Riofta's trial counsel's performance was not deficient, we do not address whether trial counsel's alleged failure to request DNA testing was prejudicial to Riofta.
¶ 63 We deny Riofta's personal restraint petition and affirm the trial court's denial of his request under RCW 10.73.170 for post-conviction DNA testing.
We concur: ARMSTRONG and HUNT, JJ.
NOTES
[1] We rejected his direct appeal in an unpublished decision in September 2003. 118 Wash.App. 1025, 2003 Wash.App. LEXIS 1880 (2003).
[2] Laws of 2005, ch. 5, § 1.
[3] The direct appeal and Riofta's PRP are part of the Innocence Project Northwest Clinic at the University of Washington School of Law.
[4] For clarity, we refer to Ratthana Sok as "Sok" and refer to his brother, Veasna, by his first name.
[5] Sok and Riofta lived about six blocks from one another.
[6] "1RP" indicates the verbatim report of proceedings from Alexander Riofta's November 2000 trial. Although the official transcript of Riofta's trial is not included in the record, the State appended 300-400 pages to its August 16, 2005 Response to Personal Restraint Petition. "2RP" indicates the verbatim report of proceedings from Riofta's June 2005 hearing on his request for DNA testing.
[7] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[8] Riofta's mother testified that when she returned from work at about 3:30 A.M. on January 27, 2000, Riofta was sleeping in his room. Although she went to bed, she told the jury that she sleeps with her door open and that she would have heard Riofta leave, but she did not. She further testified that Riofta woke her up at 11:00 A.M. to request bus money to get to work.
[9] Riofta also asserts that he did not choose to forego DNA testing at trial. He implies that his trial counsel never discussed it with him and that his trial counsel never considered DNA testing of the white hat. This contention is effectively a reiteration of Riofta's ineffective assistance of counsel claim discussed in his PRP and will not be addressed here.
[10] The State is correct that nothing in RCW 10.73.170's language suggests that we must engage in an analysis of the relative strength or weakness of the State's case.
[11] In his reply, Riofta clarifies that his PRP is primarily based on ineffective assistance of counsel. Because other portions of both his PRP and his PRP Reply are not entirely clear on this matter and suggest broader Brady and due process claims, we address the three issues individually.
[12] Among other things, a petitioner is under a "restraint" if the petitioner is confined under a judgment and sentence resulting from a decision in a criminal proceeding. RAP 16.4(b).
[13] Riofta's cited cases were decided when DNA testing was relatively new technology, and not as widely accepted or affordable. See, e.g., Dabbs v. Vergari, 149 Misc.2d 844, 570 N.Y.S.2d 765 (N.Y.Sup.Ct.1990); State v. Thomas, 245 N.J.Super. 428, 586 A.2d 250 (App.Div.1991); Sewell v. State, 592 N.E.2d 705 (Ind.Ct.App.1992); Commonwealth v. Brison, 421 Pa.Super. 442, 618 A.2d 420 (1992). But during Riofta's trial in 2000, DNA testing was established and common.
[14] Citing Herrera v. Collins, 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the State contends that absent an independent constitutional violation occurring in the underlying state criminal proceeding, Riofta cannot assert a claim of innocence based on newly discovered evidence, namely, prospective DNA test results of the white hat. Herrera is inapplicable here. Riofta has not advanced a freestanding claim of innocence based on newly discovered evidence, a requirement for Herrera to apply. 506 U.S. at 400, 113 S.Ct. 853. Rather, he in fact claims an independent constitutional violation at the underlying state criminal proceeding-specifically, that his Sixth Amendment right to effective assistance of counsel was violated at trial because his trial counsel did not request DNA testing of the white hat. Further, Riofta himself concedes that any DNA evidence recovered from the white hat is not "newly discovered evidence." PRP Reply at 15.
[15] In its closing argument, the State contended that Riofta assaulted Sok to intimidate Veasna so that he would not testify against his Trang Dai codefendants. Veasna did repudiate his agreement with the State to testify against the co-defendants within about two weeks of the assault on his brother.
[16] See 1RP at 246-249.