[No. 57938-0-I.   Division One.   October 8, 2007.]

EUFEMIA "EMMA" MORGAN ET AL., *Individually and on Behalf of a Class of Persons Similarly Situated, Respondents,* v. GERALD KINGEN ET AL., *Appellants.*

*William K. McInerney, Jr.* (of *WK McInerney, PLLC*), for appellants.

*Claudia Kilbreath* (of *Short Cressman & Burgess, PLLC*), for respondents.

¶1 Cox, J. — A critical test in an action for unpaid wages under RCW 49.52.070 is whether the employer's failure to pay wages is "willful."[1] Whether the failure to pay wages is "willful" turns on whether the employer's refusal to pay is volitional: whether " 'the [employer] knows what he is doing, intends to do what he is doing, and is a free agent.' "[2] A failure to pay wages for financial reasons is not recognized as a basis to show a lack of willfulness under RCW 49.52.070.[3]

¶2 Here, Gerald Kingen and Scott Switzer were both officers of Funsters Grand Casino, Inc., a company they operated before and after it filed for protection under chapter 11 of the United States Bankruptcy Code. The trial court correctly granted summary judgment to Funsters' employees because their earned wages were not paid either by the company or by Kingen and Switzer. Moreover, the measure of exemplary damages in this case—the doubling of total wages without deductions—was correct. Finally, the trial court did not abuse its discretion in deciding the amount of attorney fees awarded to the successful employ-

---

[1] *Schilling v. Radio Holdings, Inc.*, 136 Wn.2d 152, 159, 961 P.2d 371 (1998).

[2] *Id.* at 159-60 (internal quotation marks omitted) (quoting *Brandt v. Impero*, 1 Wn. App. 678, 681, 463 P.2d 197 (1969)).

[3] *Id.* at 163-65; *id.* at 166 (Alexander, J., dissenting).

ees in this suit. However, the absence of findings and conclusions for a portion of the fee award prevents our review of that portion of the award. We affirm the summary judgment order and remand to the trial court with directions concerning the award of attorney fees below and on appeal.

¶3 In the summer of 2001, Kingen and Switzer established Funsters Grand Casino, Inc., a minicasino in SeaTac, Washington. Kingen owned a 31 percent ownership interest in Funsters, and Switzer held a 7 percent ownership interest.

¶4 As CFO (chief financial officer), Switzer managed the casino's finances. He also acted as the company's general manager. As CEO (chief executive officer) and president, Kingen set compensation for senior employees and had authority to hire and fire employees. Both Kingen and Switzer controlled the payment of employees. They also had authority to prioritize the payment of wages and the other obligations of the company.

¶5 Funsters opened for business in August 2001 in poor financial condition. Renovation costs exceeded its estimates. Soon after the opening, the company experienced further losses from severe reduction in air traffic and hotel occupancy in the SeaTac area due to the 9/11 terrorist attacks. More specifically, payroll checks were being returned by the company's bank to employees due to insufficient funds. Kingen, Switzer, and other owners of Funsters made capital contributions to the company in order to allow it to meet its obligations.

¶6 In August 2002, Funsters filed for protection under chapter 11 of the Bankruptcy Code. While the company operated under chapter 11, Kingen and Switzer hoped that the casino would turn a profit. This was based, in part, on the hope that the Washington Legislature would allow nontribal casinos to have slot machines. This never materialized, business continued to decline, and the United States trustee in the bankruptcy proceeding moved to convert or dismiss the chapter 11 proceeding. During a

hearing on the motion, the owners of Funsters were unwilling to make additional capital contributions to the company, and the bankruptcy court converted the case to a chapter 7 liquidation on April 7, 2003.

¶7 As of the time of the conversion, the employees had earned unpaid wages for two pay periods: March 10 to 23, 2003 and March 24 to April 6, 2003. The total unpaid wages for these two periods was then estimated to be over $179,000.[4] When the bankruptcy trustee seized the assets of Funsters on April 7, the date the bankruptcy court converted the case to a chapter 7 liquidation, there was only $85,823.23 in cash. This amount was insufficient to pay the earned wages of the employees. And the bankruptcy court was unwilling to allow the distribution of any of the seized funds to pay wages in view of the Bankruptcy Code's specification of administrative priorities.[5]

¶8 Eufemia Morgan, Nancy Pitchford, and Daniel McGillivray (collectively Morgan) filed this class action on behalf of themselves and over 180 other former employees to recover their unpaid wages. Based on RCW 49.52.050 and RCW 49.52.070, they sought personal liability for exemplary damages for the unpaid wage claims against Kingen and Switzer, the officers of Funsters. The trial court granted summary judgment to Morgan as to liability. Thereafter, following submission of additional evidence regarding exemplary damages, prejudgment interest, fees, and costs, the court entered an amended judgment against Kingen and Switzer.

¶9 Kingen and Switzer appeal. Morgan cross-appeals the award of attorney fees.

## WAGE CLAIM

¶10 Kingen and Switzer argue that the trial court erred in granting Morgan's motion for summary judgment, con-

---

[4] Clerk's Papers at 65, 121.

[5] Clerk's Papers at 352.

cluding that they are personally liable for the employees' unpaid wages under RCW 49.52.070. Specifically, they argue that Morgan never established that they violated RCW 49.52.050 by "willfully and with intent to deprive" failing to pay wages. We disagree.

¶11 A motion for summary judgment may be granted when there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[6] A material fact is one on which the outcome of the litigation depends.[7]

¶12 The state legislature has shown a strong policy in favor of ensuring payment of wages by enacting criminal and civil penalties for the willful failure to pay employees the wages they have earned.[8] In a proper case, the officers, vice principals, and agents of an employer are personally liable for exemplary damages and attorney fees for the employer's failure to pay earned wages.[9]

¶13 The purpose of these statutes is to see that employees realize the full amount of the wages to which they are entitled.[10] The cases also establish that these statutes must be liberally construed to advance the legislature's intent to protect employee wages and assure payment.[11]

¶14 "The critical determination in a case under RCW 49.52.070 for double damages is whether the employer's failure to pay wages was 'willful.' "[12] The supreme court's test for "willful" failure to pay is simple: "the employer's refusal to pay must be volitional. Willful means 'merely

---

[6] CR 56(c).

[7] *Owen v. Burlington N. Santa Fe R.R.*, 153 Wn.2d 780, 789, 108 P.3d 1220 (2005).

[8] *Schilling*, 136 Wn.2d at 157.

[9] *Id.* at 158-59.

[10] *Id.* at 159.

[11] *Id.*

[12] *Id.*

that the person knows what he is doing, intends to do what he is doing, and is a free agent.' "[13]

■ ¶15 Whether an employer acts "willfully" for purposes of the statute is a question of fact.[14] But where there is no dispute as to the material facts, summary judgment is proper.[15]

■ ¶16 The cases establish two instances when an employer's failure to pay wages is not willful: "the employer was careless or erred in failing to pay, or a 'bona fide' dispute existed between the employer and employee regarding the payment of wages."[16]

¶17 RCW 49.52.070 provides a civil remedy against the employer and its officers and agents:

> Any employer and *any officer*, vice principal or agent of any employer who shall violate any of the provisions of subdivision[s] [RCW 49.52.050(2)] shall be liable in a civil action by the aggrieved employee or his assignee *to judgment for twice the amount of the wages unlawfully rebated or withheld by way of exemplary damages, together with costs of suit and a reasonable sum for attorney's fees*: PROVIDED, HOWEVER, That the benefits of this section shall not be available to any employee who has knowingly submitted to such violations.[17]

¶18 RCW 49.52.050(2), to which the above statute refers, holds any employer liable who

> [w]ilfully and with intent to deprive the employee of any part of his wages, shall pay any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract; . . . .

---

[13] *Id.* at 159-60 (internal quotation marks omitted) (quoting *Brandt*, 1 Wn. App. at 681).

[14] *Id.* at 160.

[15] *Id.*

[16] *Id.*

[17] (Emphasis added.)

¶19 No one argues that any employee knowingly submitted to the alleged violations at issue here. Thus, the provision in the first of the two above statutes is not before us. Likewise, Kingen and Switzer do not argue that either employer carelessness or error or a "bona fide" dispute exists.

¶20 Rather, Kingen and Switzer argue that Morgan failed to establish the absence of a genuine issue of material fact whether Funsters, the employer, "willfully and with intent to deprive the employee[s]" failed to pay wages. Specifically, they contend that the conversion of Funsters' chapter 11 proceeding to a chapter 7 liquidation relieved the company (and them) of any ability to willfully deprive the employees of their wages.

¶21 This case is largely controlled by *Schilling v. Radio Holdings, Inc.*[18] That case is very similar to this one in terms of its facts.

¶22 There, Robert Bingham was the president and shareholder of Radio Holdings, Inc. The company began experiencing financial difficulties and stopped issuing regular paychecks to its employees. Instead of paychecks, Radio Holdings issued "advances on payroll due," which were varying cash amounts representing a portion of each employee's earned wages. The balances of the earned wages were to be paid at a later date.

¶23 The terms of a sale of Radio Holdings to Children's Media Network (CMN) referenced the unpaid wages of employees by requiring Radio Holdings to pay them. To the extent they were unpaid as of closing, CMN was to be allowed a credit to permit CMN to pay them. CMN never paid the wages, and Bingham set aside $25,000 to pay the wages. Because the sale did not timely close, wages continued to accrue and exceeded this $25,000 amount. Moreover, Bingham withdrew $13,000 from this fund to pay a former employee who threatened to sue Radio Holdings for sexual harassment.

---

[18] 136 Wn.2d 152, 961 P.2d 371 (1998).

¶24 Sarah Schilling was among the employees whose wages were unpaid. Schilling had worked without payment for a year. After the closing of the sale, CMN paid Schilling only a small portion of her back wages.

¶25 She sued Bingham for unpaid wages under RCW 49.52.070, and the trial court granted her motion for summary judgment, awarding her exemplary damages plus attorney fees and costs.[19] The supreme court granted direct review.

¶26 According to that court, the critical issue in a case under the statutes before us is whether the employer's failure to pay wages was "willful." The court articulated the test as whether the employer's failure to pay was volitional: " 'that the person knows what he is doing, intends to do what he is doing, and is a free agent.' "[20]

¶27 It was undisputed that Radio Holdings paid Schilling less than what she was owed, and that Bingham was aware of this.[21] The court determined that neither carelessness nor a bona fide dispute was at issue.

¶28 Importantly, the court expressly rejected Bingham's "financial inability" argument, noting that there is no published Washington decision that has held that an employer's financial status renders refusal to pay nonvolitional.[22] The court held that the actions were knowing and intentional, and thus "willful" for purposes of liability under RCW 49.52.070.

¶29 Here, Kingen and Switzer, both of whom were officers of Funsters, continued to operate the company before and after bankruptcy proceedings. They did so despite its financial difficulties. They made decisions about

---

[19] *Id.* at 157.

[20] *Id.* at 159-60 (internal quotation marks omitted) (quoting *Brandt*, 1 Wn. App. at 681).

[21] *Id.* at 161.

[22] *Id.* at 164; *id.* at 166-67 (Alexander, J., dissenting) (acknowledging that no case had indicated that a failure to pay wages for financial reasons shows a lack of willfulness and stating that such a test should apply).

payroll, controlling payments to employees and other credi-
tors based on their decisions about which of Funsters'
competing creditors would be paid. They permitted unpaid
wages for two pay periods to accrue to over $179,000 as of
early April 2003. Their hope that business would improve
due to legislative enactments concerning gambling never
materialized. The bankruptcy court ultimately converted
the chapter 11 debtor-in-possession proceeding to a chapter
7 liquidation in light of the financial realities of the situa-
tion. This record fully supports the grant of summary
judgment on the basis that nonpayment of wages was
willful.

¶30 There is no assertion and no proof that either
carelessness or any bona fide dispute existed between the
company and its employees over wages. Thus, we need not
address those potential defenses to the employees' claims.

¶31 The supreme court expressly rejected the financial
inability of an employer to pay as a defense to personal
liability of its officers in *Schilling*. The legislature has left
undisturbed that reading of the wage claim statute.[23] Thus,
we conclude the bankruptcy proceeding of Funsters does
not relieve Kingen or Switzer from personal liability under
the statute. As Morgan argues, such a defense to personal
liability for officers, vice principals, and agents of employers
would severely undercut the strong legislative policy to
ensure wages are paid if the employer files for bankruptcy.

¶32 Kingen and Switzer argue they have no personal
liability for the unpaid wages of employees because they
had no control over the payment of earned wages once the
bankruptcy trustee seized Funsters' assets on conversion to
chapter 7 liquidation on April 7, 2003. They stress employ-
ees were not due to be paid until April 11, four days after

---

[23] *See Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d
778, 789, 719 P.2d 531 (1986) (legislative inaction after judicial interpretation of
a statute indicates legislative approval of the court's construction of the statute).

the conversion. They rest this argument principally on *Ellerman v. Centerpoint Prepress, Inc.*[24]

¶33 First, they overlook the fact that two pay periods for earned wages are at issue: March 10 to 23, 2003 and March 24 to April 6, 2003. The conversion and seizure of assets were on April 7, 2003, after the last of these two periods.

¶34 Unpaid wages for the first of these periods exceeded $23,000.[25] These wages were incurred and due to be paid on March 28. Significantly, this was at a time when Kingen and Switzer were operating Funsters as a debtor-in-possession under chapter 11. The record is clear that Kingen and Switzer were in control of payments by Funsters during March 2003. In short, they cannot rely on events subsequent to March to relieve them from personal liability for unpaid wages earned during that time.

¶35 Second, *Ellerman* is distinguishable. There, the issue was whether Centerpoint's business manager, Betty Handly, was a "vice principal" or "agent" of the company for purposes of liability under RCW 49.52.070.[26] The supreme court held that Handly was not a "vice principal" or "agent" of Centerpoint for purposes of the statute because she had no authority to sign checks and had no control over the payment of its employees.[27] Thus, the purpose of the court's analysis was to define "vice principal" and "agent" under the statute.

¶36 Unlike *Ellerman*, both Kingen and Switzer were directly involved in the payment decisions regarding employees. Kingen was the CEO and president of the company, and Switzer was the CFO. They both had authority to determine whether or not the employees were issued paychecks, and they exercised that authority before and during the bankruptcy proceedings.

---

[24] 143 Wn.2d 514, 22 P.3d 795 (2001).

[25] Clerk's Papers at 65, 68.

[26] *Ellerman*, 143 Wn.2d at 519.

[27] *Id.* at 521, 523.

¶37 As we have stated above, they specifically exercised this authority during the chapter 11 proceedings while Funsters was operating as a debtor-in-possession. They had control during that period of time. Thus, to that extent, *Ellerman* is of no help to them, even under their theory.

¶38 Third, even if we agreed that *Ellerman* stands for the proposition that lack of control over payment of earned wages relieves either a bankrupt employer or its officers from liability under RCW 49.52.050 or RCW 49.52.070, that would not change our conclusion in this case. Funsters had only $85,000 in cash to pay wages exceeding $179,000 on the date of conversion to chapter 7. Payday was four days later. Control over the payment of wages was irrelevant, given the fact there was insufficient cash to pay the wages. This is so regardless of whether the Bankruptcy Code permitted payment on payday. The bankruptcy trustee for Funsters had insufficient funds to pay wages on payday. But, as *Schilling* teaches, the financial inability of Funsters to pay the earned wages on payday is not a defense to personal liability of its officers under RCW 49.52.050 and RCW 49.52.070.

¶39 Kingen and Switzer also cite two federal appellate cases, *Belcufine v. Aloe*,[28] and *DeBreceni v. Graf Bros. Leasing, Inc.*[29] Neither case controls here.

¶40 In *Belcufine*, a divided panel of the Third Circuit Court of Appeals held that officers of a corporation are not liable for employees' unpaid vacation and retirement benefits that were earned prepetition, but that were due after the corporation filed for protection under chapter 11 of the Bankruptcy Code.[30] The court reasoned that under the Pennsylvania Wage Payment and Collection Law, 43 PA. STAT. ANN. §§ 260.1-.12 (WPCL), a corporate manager's liability is contingent on the corporation's failure to pay

---

[28] 112 F.3d 633 (3d Cir. 1997).

[29] 828 F.2d 877 (1st Cir. 1987).

[30] 112 F.3d at 639.

debts that it owes.[31] The court reasoned that once a corporation files for chapter 11, it is obligated to pay wages and benefits only to the extent required by bankruptcy law. "Hence, when a corporation under Chapter 11 fails to make payments that the Bankruptcy Code does not permit, the contingency needed to trigger the liability of corporate managers under Pennsylvania WPCL never occurs."[32]

¶41 The dissent disagreed with the majority's analysis. The dissent noted that in the absence of bankruptcy, the WPCL mandated that the company's officers would be personally liable for the unpaid benefits.[33] It then stated that whether the liability of company officers under the WPCL was properly characterized as either contingent or primary made no difference. Analogizing the statutory framework to an ordinary guaranty, the dissent concluded that personal liability of the individuals arose by operation of law if an employer fails to pay the obligation.[34] Moreover, the dissent also noted that the majority's analysis amounted to rewriting the WPCL to include a bankruptcy exception for corporate officers that was not stated in the statute.[35]

¶42 We first note that the Pennsylvania statute[36] is worded differently from the Washington statute before us. Thus, it is unclear whether the legislative intents of the two statutes are the same.

¶43 Moreover, although *Belcufine* dealt expressly with nonpayment of benefits during chapter 11 bankruptcy, our supreme court in *Schilling* specifically declined to engraft a "financial inability to pay" exception into the wage claim

---

[31] *Id.*

[32] *Id.*

[33] *Id.* at 642 (Greenberg, J., dissenting).

[34] *Id.* at 644 (Greenberg, J., dissenting).

[35] *Id.* at 644-45 (Greenberg, J., dissenting).

[36] " '[A]ny group of employees, labor organization or party to whom any type of wages is payable may institute actions provided under this act.' " *Id.* at 639 (emphasis omitted) (quoting 43 PA. STAT. ANN. § 260.9a(a)).

statute without the legislature having done so. Since that case, the Washington Legislature has not taken any steps to modify the law in response to *Schilling*. We decline to read into our state law a bankruptcy exception that the legislature has not enacted.

¶44 Finally, the dissent's view in *Belcufine* analogizes the statutory framework in that case to a guaranty by designated corporate officers of the benefits obligation of the corporation. Arguably, that analogy may also be applicable to our wage claim statute. However, we need not decide in this case whether that analogy is applicable to our wage claim statute because of this state's strong public policy in favor of ensuring that earned wages are paid.

¶45 *DeBreceni* is not applicable. The issue in that case was whether a controlling shareholder or officer is an "employer" and thus personally liable for withdrawal liability under Title IV of the Employee Retirement Income Security Act of 1974 (ERISA). Unlike ERISA, the Washington wage statutes expressly state that an "officer, vice principal or agent of any employer" shall be liable under the proper circumstances.

## EXEMPLARY DAMAGES

¶46 Next, Kingen and Switzer argue that the trial court erred in calculating damages because the court awarded the employees double the gross amount of wages, without deduction for withholding taxes (federal income tax, Social Security, and Medicare). We disagree.

¶47 We interpret a statute to ascertain and give effect to the legislature's intent.[37] If the statute's meaning is plain on its face, we give effect to that plain meaning.[38] Plain meaning is derived "from all that the Legislature has said in the statute and related statutes which disclose

---

[37] *In re Det. of A.S.*, 138 Wn.2d 898, 911, 982 P.2d 1156 (1999).

[38] *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002).

legislative intent about the provision in question."[39] If the legislature does not define a word, we give it its plain and ordinary meaning.[40] An unambiguous statute is not open to judicial interpretation.[41] Statutory interpretation is a question of law that we review de novo.[42]

¶48  RCW 49.52.070 provides that any employer or officer or agent of any employer shall be liable for "twice the amount of the *wages* unlawfully rebated or withheld by way of exemplary damages."[43] This statute does not define "wages." Accordingly, we look to a dictionary for that word's ordinary meaning.

¶49  The *American Heritage Dictionary* defines "wages" as:

> Payment for labor or services to a worker, especially remuneration on an hourly, daily, or weekly basis or by the piece.[44]

¶50  Noticeably absent from the definition is any mention of deductions. Rather, wages are defined as the "payment of labor or services to a worker on an hourly, daily, or weekly basis . . . ." This means the gross amount of wages, not the net after deductions for taxes, Social Security, or other matters, is the proper measure of damages in this case.

¶51  Kingen and Switzer also argue that the employees are entitled only to their net wages because 26 U.S.C. §§ 3102 and 3402 require employers to deduct taxes before payment of wages. That is irrelevant to defining wages because the damages are exemplary damages, not merely compensatory.[45] As exemplary damages, they are intended

---

[39] *Id.* at 11.

[40] *State v. Riofta*, 134 Wn. App. 669, 683, 142 P.3d 193 (2006).

[41] *Harmon v. Dep't of Soc. & Health Servs.*, 134 Wn.2d 523, 530, 951 P.2d 770 (1998).

[42] *Rettkowski v. Dep't of Ecology*, 128 Wn.2d 508, 515, 910 P.2d 462 (1996).

[43] (Emphasis added.)

[44] The American Heritage Dictionary of the English Language 2007 (3d ed. 1992).

[45] *See Schilling*, 136 Wn.2d at 158.

to punish and deter blameworthy conduct.[46] Moreover, it is unclear to us that Kingen and Switzer have standing to assert the obligations of Funsters, the employer, to deduct taxes before payment of wages.

¶52 Because the statute is unambiguous and the damages are exemplary, the trial court correctly doubled the total wages in calculating the penalty against Kingen and Switzer.

## ATTORNEY FEES

¶53 Morgan cross-appeals and argues that the trial court abused its discretion by not awarding the full amount of the fee request. Specifically, Morgan argues that the court erred by deducting certain amounts in calculating the lodestar and in not awarding a multiplier. We hold that the trial court properly exercised its discretion in awarding fees for the interim request. We remand for entry of findings and conclusions with respect to the supplemental fee award.

### Lodestar Amount

¶54 RCW 49.52.070 provides for reasonable attorney fees and costs to employees who prevail in wage claim litigation. When calculating attorney fees, the court first begins with the lodestar figure, which is the total number of hours reasonably expended multiplied by the reasonable hourly rate of compensation.[47] In determining the number of hours reasonably expended, the attorneys must provide reasonable documentation of their work performed, the number of hours worked, and the category of attorney who performed it.[48] "The court must limit the lodestar to hours reasonably expended, and should therefore discount hours

---

[46] See BLACK'S LAW DICTIONARY 418-19 (8th ed. 2004).

[47] Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 597, 675 P.2d 193 (1983).

[48] Id.

spent on unsuccessful claims, duplicated effort, or otherwise unproductive time."[49]

¶55 We review the reasonableness of an attorney fee award for an abuse of discretion.[50] We are mindful that it is the trial judge who watches a case unfold and who is in the best position to determine the proper lodestar amount.[51]

¶56 Here, Morgan requested a total of $194,133.75 in attorney fees in two requests: an initial and a supplemental. The trial court deducted $37,654.89 from the initial fee request, writing a detailed description of its reasoning for the deduction.[52] For example, the court observed that while some of the work included in one of the categories of deductions was proper in representing the clients, that work had no bearing on the liability of the individual defendants against whom this action for unpaid wages was brought.[53] The court was within its discretion to make these deductions for excessive time spent in litigating this case.

¶57 Morgan also challenges the trial court's reduction of the hourly rate of the paralegal who updated the class list from $145 to $70 and the number of hours reasonably spent by that paralegal. The record indicates that the court considered the number of hours spent exces-

---

[49] *Id.*

[50] *Brand v. Dep't of Labor & Indus.*, 139 Wn.2d 659, 666, 989 P.2d 1111 (1999).

[51] *Chuong Van Pham v. Seattle City Light*, 159 Wn.2d 527, 540, 151 P.3d 976 (2007).

[52] The $37,654.89 deduction was comprised of the following: (1) $8,394.50 for work unrelated to the claim of unpaid wages; (2) $2,598.00 for time spent to oppose the motion to vacate a default judgment, finding the amount of time spent was excessive; (3) $3,546.60 for the amount of time spent to calculate attorney fees, finding it was excessive; (4) $2,882.37 to update and revise the class list, finding there was a lot of unexplained time to update a list that does not include a very big class; (5) $17,744.42, deducting two-thirds of the requested fees for summary judgment because the case was straightforward; and (6) $2,489.00 of excessive miscellaneous time. Clerk's Papers at 1400-11.

[53] Clerk's Papers at 1403.

sive, given the size of the class.[54] This determination was well within the discretion of the judge to decide. The court also appears to have concluded that a portion of the work that the paralegal performed, specifically "maintaining the class list," did not merit compensation at an hourly rate of $145. It further appears that the court allowed compensation at that rate for the other work the paralegal performed.

¶58 A party is entitled to compensation for a paralegal's services for legal work performed as long as the rate reflects a reasonable hourly rate.[55] We cannot say that the trial court abused its discretion by disallowing compensation for "maintaining the class list," where there was no other explanation for this charge and the court otherwise allowed compensation for legal work falling within the criteria established by the cases.

¶59 Morgan also argues that the trial court abused its discretion in reducing the supplemental fee request, which was part of the total request for $194,133.75 in fees. Morgan requested additional attorney fees in the amount of $44,761.50 and $2,235.97 in costs. Kingen and Switzer objected to the fees incurred, arguing they were not related to the recovery of unpaid wages, that many of the fees were a result of unnecessary litigation, and the time entries were not specific. The court awarded the full requested amount in costs and $26,856.90 in attorney fees. But nowhere in the record before us is there any explanation of the court's rationale for reducing the supplemental portion of the fee request. As case authority makes clear, findings and conclusions are generally required to support an award of fees.[56]

¶60 Each side argues that the other side waived the entry of findings and conclusions for the case. As a conse-

---

[54] Clerk's Papers at 1407.

[55] *Absher Constr. Co. v. Kent Sch. Dist. No. 415*, 79 Wn. App. 841, 845, 917 P.2d 1086 (1995) (applying criteria for allowing compensation for paralegal work and disallowing compensation for certain work not falling within the criteria).

[56] *Mahler v. Szucs*, 135 Wn.2d 398, 435, 957 P.2d 632 (1998).

quence, the trial court did not enter any. Whether one side or the other waived entry of findings, including those with respect to the award of attorney fees, is irrelevant. We simply cannot perform our duty to review fee awards without an adequate record. Because there is nothing in the record to allow us to review the reasons for the court's decision on the supplemental fee award, we remand for entry of appropriate findings and conclusions regarding that award.

## Contingency Adjustment

¶61 Next, Morgan argues that the trial court abused its discretion by failing to award an upward adjustment of 50 percent for the fee award. We disagree.

¶62 After the trial court calculates the lodestar, it may consider adjusting the award to reflect additional factors.[57] The party requesting a deviation from the lodestar bears the burden of justifying it.[58] " 'Adjustments to the lodestar are considered under two broad categories: the contingent nature of success, and the quality of work performed.' "[59] The contingency adjustment is based on the belief that attorneys generally will not take high risk contingency cases where there is a risk of absolutely no recovery for their services, unless they can receive a premium for taking that risk.[60] But among the most important of the guiding principles a court should follow is whether the litigation would be unsuccessful and no fee would be obtained.[61] Moreover, the risk factor should be applied only to time before recovery is assured.[62]

---

[57] *Chuong Van Pham*, 159 Wn.2d at 541.

[58] *Id.*

[59] *Id.* (quoting *Bowers*, 100 Wn.2d at 598).

[60] *Id.*

[61] *Bowers*, 100 Wn.2d at 598-99.

[62] *Id.* at 599.

¶63 In adjusting the lodestar for the risk factor, the trial court should consider the contingent nature of success at the outset of the litigation.[63] " 'This is necessarily an imprecise calculation and must largely be a matter of the trial court's discretion.' "[64]

¶64 The quality of work performed criterion is extremely limited because the reasonable hourly rate determined by the court generally reflects that consideration.[65]

¶65 Here, Morgan sought a fee multiplier based both on the contingent nature of success as well as the quality of work performed. In exercising its discretion, the court declined to award a multiplier, concluding that this wage collection case did not involve the usual risk of contingent fee cases:

> [T]his was a law suit [sic] in which the basic core fact of unpaid wages was clear, in some amount, and the defendants being pursued for this statutory remedy were easily determined *(plaintiffs' counsel checked their financial status out) to be well capable of collecting a judgment from in terms of their personal wealth*. It would seem *the usual risk factor of a contingent fee* as in a personal injury or medical malpractice *is absent in this case*.[66]

¶66 Viewing this case from the outset of the litigation, as the trial court did, we agree that it was essentially an undisputed fact that Funsters and its principals failed to pay some amount of wages. Moreover, the potential statutory liability of the defendants in this case was not a highly risky contingent claim, as the court indicated. Finally, to the extent "risk" existed, it was substantially reduced once recovery was assured by entry of the summary judgment order in favor of Morgan.[67] Thus, no contingency would

---

[63] *Chuong Van Pham*, 159 Wn.2d at 542.

[64] *Id.* (emphasis omitted) (quoting *Bowers*, 100 Wn.2d at 598-99).

[65] *Bowers*, 100 Wn.2d at 599.

[66] Clerk's Papers at 1410 (emphasis added).

[67] *Bowers*, 100 Wn.2d at 599.

have been awardable for the activities after entry of that order. In short, the trial court properly exercised its discretion with respect to the first of the two factors for awarding a contingency.

¶67 The second prong of the test addresses the quality of the work performed. Implicit in the trial court's decision in this case is the determination that the hourly rates for the legal work were sufficient to compensate for this factor. We see nothing in the record to support overturning the trial court's exercise of discretion in this respect.

¶68 Morgan contends that the likelihood of collectability of a judgment against the defendant principals of Funsters is an irrelevant factor in assessing risk. We agree that *Bowers* and the other cases do not expressly address risk in this respect. But we also conclude that it is counterintuitive to exclude from the risk assessment whether a judgment, once obtained, may be satisfied. The court found Morgan's counsel included collectability of a judgment as part of its assessment of whether to take this case. We cannot say that factor was outside the range of reasonable choices for the trial court to make when assessing whether to award a contingency.

¶69 Whether a successful plaintiff in a wage claim case bears the burden of showing that a multiplier is warranted necessarily depends on the facts of each case. It may well be the case that in other wage claim actions a contingency adjustment may be warranted. Here, we are not persuaded that Morgan has demonstrated that the trial court abused its discretion by declining to award a multiplier.

*Attorney Fees on Appeal*

¶70 Finally, Morgan requests attorney fees on appeal under RCW 49.48.030 and RCW 49.52.070. RCW 49.48.030 provides for reasonable attorney fees "[i]n any action in which any person is successful in recovering judgment for wages or salary owed." Because Morgan prevails, fees are awardable. We remand to the trial court to

determine the amount of fees on appeal, pursuant to RAP 18.1(i).

¶71  We affirm the summary judgment order. We remand to the trial court for entry of findings and conclusions for the award of supplemental attorney fees below and to determine the amount of fees on appeal.

GROSSE and DWYER, JJ., concur.

Review granted at 164 Wn.2d 1002 (2008).