[No. 66752-1-I.   Division One.   November 26, 2012.]

GUSTAVO NELSON ARZOLA ET AL., *Appellants*, v. NAME
INTELLIGENCE, INC., ET AL., *Respondents*.

*Hamilton H. Gardiner* (of *Holmquist & Gardiner PLLC*) and *Howard M. Goodfriend* (of *Smith Goodfriend PS*), for appellants.

*Karen Orehoski* and *Joseph A. Grube* (of *Ricci Grube Breneman PLLC*), for respondents.

¶1 APPELWICK, J. — In Washington, under chapter 49.52 RCW, employers that willfully fail to pay employees any part of their wages are liable to the employees for exemplary damages of twice the amount of wages wrongfully

withheld, as well as attorney fees and costs. We are asked to determine whether consideration owed to employees under stock right cancellation agreements constituted "wages," as that term is used in chapter 49.52 RCW, and whether the employees are entitled to exemplary damages. Because the payments under the agreements were not for the employees' services or labor, but were for the relinquishment of their proprietary interest in the corporation, we hold that the payments are not wages and exemplary damages are not available. We reverse the award of exemplary damages and attorney fees and costs.

## FACTS

¶2 Gustavo Arzola, Michael Klatt, and Susan Prosser were employed at Name Intelligence Inc. As part of their offers of employment, they were allotted a number of shares at the time of hiring. They were promised an allotment of additional shares for every year they received an average or above average performance rating. The number of shares allotted varied based on the annual performance rating each employee received from Name Intelligence. Klatt's offer of employment provided, in relevant part:

> We have a performance based reward system at Name Intelligence; we are giving away our company to hard working employees. As of June 1st 2006 there are currently 10,709,996 shares of Name Intelligence. It is hard to estimate the worth of the company but we believe it is worth between 10-20 Million dollars presently. We will be allotting 100,000 shares at the start of employment and every year you complete at Name Intelligence with an above average rating. For meeting an average rating you will be allotted 25,000 shares. Those shares will be granted to you five years after completion of being allotted. You must maintain consecutive employment during those five years to receive the stock grant. If at any time Name Intelligence sells its company to a third party unrelated from the company current owners all shares that are allocated will be immediately granted.

54

Arzola and Prosser stated in their declarations that they obtained stock rights in the same manner.[1,2]

¶3 Jay Westerdal was the cofounder, president, and chief executive officer of Name Intelligence. In April 2008, Westerdal informed the employees that he intended to sell the company to Thought Convergence Inc. and its subsidiary, TrafficZ Inc. The sale of the company was memorialized in a securities exchange agreement, whereby Thought Convergence and TrafficZ would purchase substantially all of Name Intelligence's assets in exchange for $16,000,000 in cash, as well as 22,927,989 shares of Thought Convergence common stock. Name Intelligence was to receive $6,000,000 on May 2, 2008; $5,000,000 on May 2, 2009; and $5,000,000 on May 2, 2010.

¶4 As a condition of the sale of the company, Name Intelligence needed to buy back all the outstanding stock rights in the company that it had given to the employees. At Westerdal's request, the employees each agreed to execute stock right cancellation (SRC) agreements. Each SRC agreement provided for three cash payments to the employee based on their proportionate ownership interest, due on the same dates as Name Intelligence was scheduled to receive its three payments from Thought Convergence.[3] They also granted the employees the option to purchase certain amounts of TrafficZ stock. The treatment of TrafficZ stock is not at issue. The SRC agreements cancelled any stock rights the employees had in Name Intelligence and stated that payments made "shall be subject to

---

[1] The record does not show what reviews Klatt, Arzola, or Prosser received, or what amount of the remaining shares were handed out to other shareholders.

[2] We use stock rights and shares interchangeably, and each includes both allotments and grants of stock.

[3] Klatt was to receive $91,699 on the effective date, and two payments of $76,415, 12 and 24 months after the effective date. Arzola was to receive $57,311 on the effective date, and two payments of $47,759, 12 and 24 months after the effective date. And, Prosser was to receive $25,000 on the effective date, and two payments of $20,833, 12 and 24 months after the effective date.

the same terms, conditions, and adjustments of the Post-Closing Payments in the Exchange Agreement."

¶5 Name Intelligence made the first payment to the employees and that payment is not in dispute. That payment appeared on the employees' W-2 forms as wages, and the employees paid both federal income tax and Medicare tax on the full amount of that payment.

¶6 Before the second payment was due in May 2009, a dispute arose between Name Intelligence and Thought Convergence about the securities exchange agreement and the two remaining payments. Following an attempt at mediation and settlement negotiations, Thought Convergence filed a lawsuit against Name Intelligence and Westerdal in federal court in California. The lawsuit sought either rescission of the securities exchange agreement or reductions in the amounts due in the second and third payments. Name Intelligence alerted the employees that the pending litigation might require a " 'Post-Closing Adjustment' " that would change the amount owing to the employees under their SRC agreements. When Thought Convergence did not pay, Name Intelligence, in turn, did not make the second payment to its employees as scheduled on May 2, 2009. The employees commenced a lawsuit alleging breach of the SRC agreement and filed a motion for partial summary judgment. On March 8, 2010, the trial court granted that motion, awarding judgment to the employees for the full amount of the May 2009 installment payment. Name Intelligence paid that judgment on March 11, 2010.

¶7 By the time the third and final payment was due, on May 2, 2010, all litigation between Thought Convergence and Name Intelligence had been resolved by settlement. As a result of that settlement, the third and final postclosing payment from Thought Convergence to Name Intelligence was reduced from $5,000,000 to $4,875,000, a total of 2.5 percent.

¶8 Name Intelligence again did not pay the employees as scheduled on May 2, 2010, instead sending a check for a lesser amount on May 7, 2010. It explained that a $400,000

postclosing adjustment in its dealings with Thought Convergence had resulted in a pro rata reduction of $14,046 to the amount collectively owed to the employees for the third payment under the SRC agreements. That reduction reflected not only the pass-through of the 2.5 percent reduction in what Name Intelligence received from Thought Convergence, but also a share of Name Intelligence's attorney fees and costs in reaching the settlement. The check to the employees was tendered as a " 'full settlement of the pending dispute.' " The employees rejected the tender. On May 24, 2010, after one of the four original plaintiffs settled, Name Intelligence tendered a " 'Good Faith Partial Payment' " that was $134,000, $11,007 less than the $145,007 final payment amount total owed to the employees under the SRC agreements. The trial court again entered a partial summary judgment in the employees' favor, finding that Name Intelligence owed the unpaid portion of the third payment. The case went to trial on the statutory wage withholding violations.

¶9 As to the second payment of $145,007, due May 2, 2009, the trial court found that it constituted wages unlawfully withheld under RCW 49.52.050. Therefore, the employees were entitled to double damages pursuant to RCW 49.52.070 in the amount of $145,007, for which Name Intelligence and Westerdal were liable. As to the third payment due May 2, 2010, the trial court found that although the majority of the $145,007 was paid 22 days late, it was not willfully withheld by Name Intelligence under chapter 49.52 RCW. The trial court found there was a bona fide dispute, but only as to 2.5 percent ($3,625) of the payment due under the SRC agreement—the prorated portion of the sums withheld from Name Intelligence by Thought Convergence under the securities exchange agreement. The additional withholding of $7,382 ($11,007-$3,625) was not justified by a bona fide dispute and was willfully withheld. It found Name Intelligence and Westerdal liable for $7,382 in double damages for the willfully withheld wages under RCW 49.52.070.

¶10 The trial court awarded prejudgment interest on the unpaid wages from the date they were owed, totaling $15,774, attorney fees of $97,860, and litigation costs totaling $4,350 under RCW 49.48.030 and RCW 49.52.070.

¶11 Name Intelligence and Westerdal timely appealed, challenging the trial court's award of exemplary damages, attorney fees, and litigation expenses.

## DISCUSSION

I. *Definition of "Wages"*

¶12 The question before us is whether the money owed by Name Intelligence to the employees under the SRC agreements constituted "wages" under chapter 49.52 RCW, entitling them to exemplary damages.

¶13 Statutory interpretation is a question of law that we review de novo. *Morgan v. Kingen*, 141 Wn. App. 143, 161, 169 P.3d 487 (2007), *aff'd*, 166 Wn.2d 526, 210 P.3d 995 (2009). We interpret a statute to ascertain and give effect to the legislature's intent. *Id.* at 160. If the statute's meaning is plain on its face, we give effect to that plain meaning. *Id.* An unambiguous statute is not open to judicial interpretation. *Id.* at 161.

¶14 Under RCW 49.52.050, employers and their officers are prohibited from willfully depriving an employee of wages. RCW 49.52.070 provides that any employer, or officer or agent of any employer, shall be liable for "twice the amount of the wages unlawfully rebated or withheld by way of exemplary damages." *See Morgan*, 141 Wn. App. at 161. Because the statute does not define the term "wages," courts give the term its plain and ordinary meaning: " 'Payment for labor or services to a worker, especially remuneration on an hourly, daily, or weekly basis or by the piece.' " *Id.* (quoting THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 2007 (3d ed. 1992)); *see also Bates v. City of Richland*, 112 Wn. App. 919, 939-40, 51 P.3d 816 (2002) (applying a definition of "wage" under the Minimum Wage

Act, RCW 49.46.010(2) (renumbered as RCW 49.46.010(7)), as " 'compensation due to an employee by reason of employment.' " (internal quotation marks omitted) (quoting *Hayes v. Trulock*, 51 Wn. App. 795, 806, 755 P.2d 830 (1988))); *Durand v. HIMC Corp.*, 151 Wn. App. 818, 831, 214 P.3d 189 (2009) ("[C]ompensation applies to more than work actually performed; it applies to any form of compensation that is a byproduct of the employment relationship."), *review denied*, 168 Wn.2d 1020, 231 P.3d 164 (2010); *Dice v. City of Montesano*, 131 Wn. App. 675, 689, 128 P.3d 1253 (2006).

¶15 The trial court considered the issue, finding

> that stock options are not wages but that the cash payments under the SRC Agreements were "wages" as that term is defined in RCW 49.48 et seq. and RCW 49.52 et seq. because it is compensation arising out of the employment relationship.

The employees argue that finding should be affirmed. They characterize the SRC agreements as a mere substitution of cash for their equity interest and assert that both the initial stock rights and the cash promised in the SRC agreements were given as compensation for work they performed. In contrast, Name Intelligence argues the stock was not wages when granted and the payments under the SRC agreements were made not for the employees' services or labor but for the relinquishment of their proprietary interest in the corporation.[4]

¶16 The employees here each received an initial grant of stock. The employees also received allotted shares of Name Intelligence stock that could mature into grants of stock either five years from the date of allotment or at the time of

---

[4] Neither party argues that Name Intelligence failed to abide by the agreement contained in the offers of employment, so we need not address those matters on appeal. The parties argue whether the allotments or grants of stock were themselves wages under the statute. We need not address that issue. The employees do not argue that any of the stock due them was not granted. So even if we were to find the allotments or grants were wages under the statute, we would conclude those wages were paid when the grants became effective. The employees argue only that they were not timely paid under the SRC for surrender of their shares.

Name Intelligence's sale to a third party. Nowhere did the offers of employment refer to the shares as options to purchase stock.[5] The offer stated that Name Intelligence was "giving away our company to hardworking employees" as a discretionary reward and incentive for above average performance. The employees were not required, under their offers of employment, to sell back their stock to Name Intelligence. Nor is there any evidence of a restriction on the holders' ability to alienate or transfer the shares after they were granted. The sole restriction was that the employee was required to maintain consecutive employment for five years to convert a stock allotment into a stock grant. The stock was treated as a true equity interest or ownership right in the company.

¶17 The sale of the company in May 2008 triggered the conversion of all shares allocated to the employees into grants of those shares by virtue of the employment agreements. Under the SRC agreements, the employees surrendered all stock rights for "all the shares of Common Stock" in exchange for payments due on May 2 of 2008, 2009, and 2010. At the point the SRC agreements were executed, the employees were in the same position as any other holder of stock—able to freely sell those rights, regardless of how they were originally obtained. The consideration the employees provided under the SRCs was not service or labor but, rather, surrender of their proprietary interest in the company stock. The monies paid for the cancellation of the stock rights cannot be said to transform into wages simply because the existence of either the stock or the SRC is a by-product of the employment relationship. We hold that the payments under the SRC are not "wages" as defined by chapter 49.48 RCW and chapter 49.52 RCW.

---

[5] The trial court and both parties below referred to the employees' stock rights as "options" or "stock options." But, that term is technically incorrect, since an option gives its owner a right to purchase at a particular price and the employees were not required to pay a price to exercise their rights to acquire their stock shares. *See In re Marriage of Ayyad*, 110 Wn. App. 462, 468, 38 P.3d 1033 (2002).

¶18 The employees suggest that Name Intelligence has already conceded the payments were wages based on its treatment of those payments as taxable wages for tax-withholding purposes. The first of the three payments made by Name Intelligence to the employees appeared on the employees' W-2 forms as wages, and the employees were required to pay income tax on those payments. But, this evidence of the employer's subjective belief about how to characterize the payments for tax purposes is irrelevant to our ultimate consideration. Nothing in the record allows us to determine whether the tax code was properly applied. We decline to draw any inference about the character of the payments.

## II. *Cross Appeal*

¶19 On May 24, 2010, 22 days after the third payment of $145,007 was due to the employees under the SRC agreements, the employees received a check from Name Intelligence for $134,000 and identified as a "Good Faith Partial Payment rest to be determined by court." The trial court found this to be the first unconditional tender of the third payment, and though it was made 22 days late, it was *not* willfully withheld under chapter 49.52 RCW. Of the unpaid balance of $11,007, $7,382 was found to be willfully withheld.

¶20 In a cross appeal, the employees argue the trial court erred by concluding the 22 day delay was not a willful withholding. But, in light of our holding above, the payments were not wages, chapter 49.52 RCW is inapplicable, and this matter becomes moot. The employees were not entitled to exemplary damages on any portion of the withheld payments.

¶21 We reverse the award of exemplary damages and attorney fees and costs.

BECKER and DWYER, JJ., concur.

After modification, further reconsideration denied April 8, 2013.

Review denied at 178 Wn.2d 1011 (2013).